1  NATALIE A. PIERCE, Bar No. 191342
   npierce@littler.com
2  LISA K. HORGAN, Bar No. 267632
   lhorgan@littler.com
3  PAUL E. GOATLEY, Bar No. 305606
   pgoatley@littler.com
4  LITTLER MENDELSON, P.C.
   333 Bush Street
5  34th Floor
   San Francisco, California  94104
6  Telephone:   415.433.1940
   Facsimile:   415.399.8490
7
   Attorneys for Defendants
8  COLUMBUS MANUFACTURING, INC. and
   ANDREA WILSON
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13  HAKAN KIP KENNEDY,                    Case No.  17-CV-03379-EMC

14              Plaintiff,                **DECLARATION OF PAUL GOATLEY IN
                                          SUPPORT OF DEFENDANTS' MOTION
15       v.                               FOR SUMMARY JUDGMENT OR, IN
                                          THE ALTERNATIVE, PARTIAL
16  COLUMBUS MANUFACTURING, INC.          SUMMARY JUDGMENT**
    AND ANDREA WILSON,
17
                Defendants.
18                                        Date:    March 15, 2018
                                          Time:    1:30 p.m.
19                                        Judge:   Hon. Edward M. Chen
                                          Dept:    Ctrm 5 - 17th Floor
20
                                          Complaint Filed:  June 5, 2017
21                                        Trial:            N/A

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA  94104
415.433.1940

DEC. OF PAUL GOATLEY ISO OF
MSJ                                       CASE NO. NO. 17-CV-03379-EMC

1    I, Paul Goatley, declare:

2         1.    I am an associate at Littler Mendelson, P.C. and attorney of record for

3    Defendants Columbus Manufacturing, Inc. and Andrea Wilson (collectively, "Defendants") in this

4    action.  I am licensed to practice law in the State of California.  I have personal knowledge of the

5    facts set forth in this Declaration and, if called upon as a witness, could and would competently

6    testify to said facts.

7         2.    On December 28, 2017, Natalie A. Pierce, counsel of record for Defendants in

8    this matter and a shareholder at Littler Mendelson, P.C. deposed Plaintiff Hakan Kip Kennedy

9    ("Plaintiff"). Attached as Exhibit A is a true and correct copy of relevant excerpts and exhibits from

10   the certified transcript of Plaintiff's December 28, 2017 deposition.

11        3.    Attached as Exhibit B is a true and correct copy of Defendants' Special

12   Interrogatories to Plaintiff, Set One.

13        4.    Attached as Exhibit C is a true and correct copy of Plaintiff's Response to

14   Defendants' Special Interrogatories to Plaintiff Set One and the verification thereto.

15        I declare under penalty of perjury under the laws of the United States that the

16   foregoing is true and correct.

17        Executed on February 8, 2018, at San Francisco, California.

18

19

20        Paul E. Goatley

21

22

23

24

25

26

27

28

DEC. OF PAUL GOATLEY ISO OF MSJ                    1.                    CASE NO. NO. 17-CV-03379-EMC

# Exhibit A

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   HAKAN KIP KENNEDY,

5          Plaintiff,

6      vs.                    Case No. 3:17-cv-03379-EMC

7   Columbus Manufacturing,
    INC., and ANDREA WILSON,

8

          Defendants.

9   _____/

10

11

12

13      VIDEOTAPED DEPOSITION OF HAKAN KIP KENNEDY

14            San Francisco, California

15             December 28, 2017

16

17

18

19

20

    Reported by:

21

    Diane M. Winter

22

    RMR, CRR, CSR No. 3186

23

24   Job No.: 10038703

25

1    didn't tell you that it could impact your ability to

2    tell the truth?

3          A.   Not specifically telling the truth, but

4    other stuff.  Like I said --

5          Q.   Like driving?

6          A.   Yeah.

7          Q.   Okay.  What did you do to prepare for

8    today's deposition?

9          A.   I don't understand your question.

10         Q.   Yeah.  So let's just, for the record, make

11   clear you are not represented by an attorney here at

12   the deposition, correct?

13         A.   Not at the moment.

14         Q.   Were you -- when is the last time that you

15   worked with a retained attorney in this case?

16         A.   I did not have an attorney in this case.

17         Q.   Okay.  So you've never retained --

18         A.   But I had an attorney for my Workers' Comp

19   disability.

20         Q.   You had an attorney for --

21         A.   I have an attorney actually.

22         Q.   You have an attorney for your Workers'

23   Compensation case.  However, you do not have --

24         A.   Not for employment.

25         Q.   -- not for your civil employment case.

1    Okay.  And is that true at all times during this case?

2          A.   Yeah.  I haven't hired any attorney.

3          Q.   Okay.

4          A.   I have consulted, but I haven't hired any

5    attorney.

6          Q.   So when you were getting ready to come to

7    this deposition, did you review any documents before

8    coming here today?

9          A.   I have reviewed the documents that you have

10   sent.

11         Q.   Uh-huh.

12         A.   And the court documents that I have.

13         Q.   Okay.

14         A.   Not all of them, but as much as I can in a

15   quick review.

16         Q.   Did you speak with anyone to get ready for

17   today's deposition?

18         A.   No.  Regarding the deposition, no.

19   Regarding the case, it's a different question.

20         Q.   All right.  Well, when is the last time

21   that you spoke with any non-attorneys regarding this

22   case?

23         A.   I have shared with my family.

24         Q.   All right.  Have you shared with anyone

25   besides your wife?

**Hakan Kip Kennedy**                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1     Q.   And which language do you use most
2  frequently?
3         A.   English.
4         Q.   Can you read English proficiently?
5         A.   Yes.
6         Q.   And can you write English proficiently?
7         A.   I guess so.  I'm not perfect.
8         Q.   But proficiently, you would say?
9         A.   I try.
10        Q.   Which language did you speak in the
11  workplace during your time at Columbus?
12        A.   English.
13        Q.   Do you have difficulty speaking, reading or
14  writing in English?
15        A.   Sometimes based on the complicity.  If it's
16  a legal, yes, I have some difficulties.  I don't own
17  the legal language.
18        Q.   And was that the reason that you conferred
19  with employment attorneys?
20        A.   I just consulted to get some help,
21  direction.
22        Q.   Uh-huh.  Including with the severance
23  agreement?
24        A.   Not the severance agreement, no.  The
25  employment discrimination.

1      Q.    And when is the last time you received any

2   disability benefits?

3      A.    Through Social Security?

4      Q.    Through any provider.

5      A.    Should be this month sometime, third week.

6      Q.    So you are still receiving some --

7      A.    I am receiving, yes.

8      Q.    And do you recall the amount of the

9   disability payment you received?

10     A.    Something around $2,000.

11     Q.    And is that per month?

12     A.    Yeah.

13           Q.    Where did you work prior to working for

14   Columbus Manufacturing?

15           A.    At Nestle'.

16           Q.    How long did you work there?

17           A.    I worked a year.

18           Q.    What was your role at the company?

19           A.    QA management.

20           Q.    And why did you leave your employment at

21   Nestle'?

22           A.    I wasn't happy with the company and the

23   location.

24           Q.    And then you came directly to work for

25   Columbus Manufacturing?

1        A.   I suppose in a few months, yes.

2        Q.   So you quit before you had new employment?

3        A.   Yes.

4        Q.   So you weren't asked to leave Nestle'?

5        A.   No.

6        Q.   No.  When did you begin your employment

7   with Columbus?

8        A.   Late 2011 or beginning of 2012.  I guess I

9   got the offer late 2011, so surely beginning of 2012,

10  January.

11       Q.   Which -- at which location did you start at

12  Columbus Manufacturing?

13       A.   South San Francisco.

14       Q.   And the Forbes plant is in -- is in --

15  (Clarification by the reporter) -- the Forbes plant is

16  in South San Francisco, correct?

17       A.   Yes.

18       Q.   Did you ever change your roles within

19  Columbus?

20       A.   No, the same role, QA II senior QA manager.

21       Q.   When was your last date of employment with

22  Columbus?

23       A.   They terminated me by August 29.  But I

24  signed the contract -- the agreement on October 20th.

25       Q.   You say you signed -- your last date of

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1   employment was August 29th, but you signed the

2   severance agreement with Columbus Manufacturing on

3   October 20th of 2015?

4           A.   Right, yeah.

5           Q.   Yeah.  Okay.  So after your last date of

6   employment with Columbus there was a couple month delay

7   before you signed the severance agreement?

8           A.   Right.  During my Workers' Comp deposition.

9           Q.   Okay.  All right.  I think we've been

10  going -- no, not quite.  Okay.  I'm -- I tend to allow

11  for breaks on the hour.  I'll leave it to you to let me

12  know if you need a break --

13          A.   Sure, I can use it --

14          Q.   -- sooner than on the hour.

15          A.   -- just to stretch out.

16          MS. PIERCE:  We'll go ahead and take a look

17  at Exhibit 3.

18          (Deposition Exhibit 3 was

19          marked for identification.)

20          THE REPORTER:  He did say he could use a

21  break.

22          MS. PIERCE:  Oh, you could use a break?

23          THE WITNESS:  11:00 is fine.

24          MS. PIERCE:  11 is fine.  Like I said, I

25  will take --

**Page 31**

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1   than what you wanted, correct?

2        A.   Yeah.  That's not what I wanted.  That's

3   not what I wished for.  And I was under the impression

4   that will be different during my Workers' Comp and

5   going through that Workers' Comp.  So that was

6   different than what I expected.  And that was different

7   than originally was given.  The originally being

8   promised, originally being presented.

9        Q.   And did you have an understanding that the

10   severance amounts being offered to you were separate

11   and apart from your Workers' Compensation proceedings?

12        A.   I mean it was around the same time, it was

13   around the same issues.  It was all that conversation,

14   communication we had included both issues.

15        Q.   Did you think that your having signed and

16   returned the severance agreement would do anything to

17   stop you from proceeding with your Workers'

18   Compensation claim?

19        A.   I don't understand.

20        Q.   Let me ask it this way.  You signed the

21   severance agreement, correct?

22        A.   Okay.

23        Q.   Yes?

24        A.   I've signed the October 20 during my

25   Workers' Comp deposition.

**Hakan Kip Kennedy**                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1          A.    Yes.

2          Q.    And did you file any paperwork in

3    connection with that injury?

4          A.    I sent a notification to the company.

5          Q.    But did you file any Workers' Compensation

6    paperwork?

7          A.    It's a company procedure to, after being

8    notified, to go through the process.

9          Q.    And did you take any time off in 2013 in

10   relation to that injury?

11         A.    2013, I may have taken --

12         Q.    You don't recall one way or the other?

13         A.    I don't recall.  But I have start to take

14   time more by beginning of 2014, part-time work, and

15   then --

16         Q.    So let's take a look at that time line,

17   okay, the 2014 time line about your request.

18               Now you knew, along with the other

19   managers, as of Thanksgiving 2013 that jobs would be

20   ending, that there would be the plant closure in 2015,

21   correct?

22               A.    No, they didn't say 2015.  They said 36

23   months, in a few years, the plant will continue.  They

24   said -- who was in the room?  Andrea, Ken and Paul was

25   in the room.

**Page 50**

 1   **official announcement to the rest of everyone came**

 2   **out --**

 3          A.   To the workers, yes.

 4          **Q.   -- through Ken in early 2014?**

 5          A.   I guess so.  I guess it was Ken or company

 6   president or both.

 7          **Q.   Okay.**

 8          A.   It was official announcement.

 9               MS. PIERCE:  And then you said that you

10   received a letter in connection with that announcement.

11   And so let's go ahead and mark this next one as Exhibit

12   5, and see if this is the letter you are referring to.

13               (Deposition Exhibit 5 was

14               marked for identification.)

15          **Q.   (BY MS. PIERCE)  Is this the letter that**

16   **you were referring to?**

17          A.   I don't remember the deals.  But the date

18   is around that time.

19          **Q.   Okay.**

20          A.   Seems like.

21          **Q.   All right.  I want to turn your attention**

22   **next to -- so Exhibit 5 you said that you rejected,**

23   **that you wouldn't sign that severance agreement,**

24   **correct?**

25               A.   No.  I immediately rejected it.

```
 1              (Deposition Exhibit 6 was
 2              marked for identification.)
 3         Q.  (BY MS. PIERCE)  Okay.  And was this
 4  Exhibit 6 the email in which you officially rejected
 5  the offer?
 6         A.  Yeah, it seems like it.
 7         Q.  All right.  Let's go ahead and turn back to
 8  Exhibit 4 for a moment.  I think we were on that
 9  exhibit before we took a break.  Your overall
10  performance score for 2012 was 2.42, correct?
11         A.  2012, yeah, that's what it says, but I have
12  disputed that.
13              MS. PIERCE:  Okay.  Let's mark this one as
14  Exhibit 6 -- 7.
15              (Deposition Exhibit 7 was
16              marked for identification.)
17         Q.  (BY MS. PIERCE)  Do you recognize this
18  document?
19         A.  Yeah, it seems familiar.
20         Q.  And what -- what do you recall this being?
21         A.  This is my Disciplinary Action Report and
22  additional comments from me regarding the disputes on
23  this.
24         Q.  And is -- is that your signature on the
25  last page?
```

1    medical condition in 2012.

2            Q.    Okay.  Okay.  All right.  So let me show

3    you --

4            A.    This is about 2014, right?

5            Q.    That's about 2014.

6            A.    Because you are asking 2014 --

7            Q.    So then I was asking you about 2012,

8    because there were comments in 2012 that you disagreed

9    with as well.

10                  MS. PIERCE:  Okay.  So this next one we're

11   going to mark as Exhibit 9.

12                  (Deposition Exhibit 9 was

13                  marked for identification.)

14           Q.    (BY MS. PIERCE)  Okay.  Have you had a

15   chance to review it?

16           A.    I mean the date seems -- I don't remember

17   the exact details, but the dates -- there may be one

18   more agreement in-between.

19           Q.    I just want to ask some questions about

20   this particular agreement.

21           A.    Okay.

22           Q.    Okay.  You had referenced earlier an

23   agreement that you eventually signed because Andrea

24   Wilson wouldn't accept you signing and returning an

25   agreement with your writing on it, with your proposed

**Hakan Kip Kennedy**          **Kennedy vs. Columbus Manufacturing, Inc., et al.**

1    amendments.

2              Do you recall that?

3         A.   That's what she has emailed.

4         Q.   Okay.  And so you said that subsequent to

5    her informing you of this, you signed the agreement

6    without your written amendments to it.

7              Do you recall that?

8         A.   Yeah.  That's what I send it October 12th,

9    with the amendments.

10        Q.   Uh-huh.

11        A.   And then she sent me back, she refused

12   that, and she want me to sign the blank copy, the

13   original dating.

14        Q.   And then so this Exhibit 9 is the one --

15        A.   This was being signed I believe October

16   12 -- 20.  Not October 12th.  October 20 during the

17   Workers' Compensation deposition.

18        Q.   And did you back date the signature date so

19   that it would be in line with the acceptance window

20   that you were provided?

21        A.   That's what I remember, like that's what

22   she wanted.  And then you brought me a copy of this,

23   the check, yeah.  That's what I remember, too, to have

24   it signed like this.

25        Q.   Okay.

**Hakan Kip Kennedy**                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1          A.    That's what she wanted for me to get the

2     benefits.

3          Q.    So you returned an agreement with your

4     written amendments on it on October 12.  And then

5     Andrea Wilson said I won't accept this with your

6     written amendments on it.  And -- but I will accept if

7     you send one back without your written amendments.  And

8     so you printed it, which is the exhibit --

9          A.    I didn't print.  I was in San Francisco.

10         Q.    Okay.  You had a copy?

11         A.    I got the copy from you with the check in a

12    mailing envelope or something.

13         Q.    Okay.

14         A.    I don't remember exactly, but something

15    like that.

16         Q.    So you had a copy of it in any event.  And

17    so you signed this, what we've marked as Exhibit 9.

18    And you dated it October 12th, because in the first

19    paragraph it says that you were supposed to sign and

20    return it by October 12th, 2015; is that correct?

21         A.    I didn't understand your question.  I

22    didn't sign this October 12th.  That's what I'm --

23         Q.    Yeah.  You signed it on October 20th.  But

24    I'm asking is this reason that you dated it October

25    12th --

**Hakan Kip Kennedy**                    **Kennedy vs. Columbus Manufacturing, Inc., et al.**

```
 1          A.   It's only because I was being told so, to
 2    do that.
 3          Q.   And is that because --
 4          A.   Not because -- because Andrea, the HR told
 5    me to.
 6          Q.   She said it was okay to sign it -- to date
 7    it October 12th?
 8          A.   Yeah, that was -- that's what I remember.
 9          Q.   Okay.
10          A.   That's why I signed the same date.
11          Q.   And this is the agreement you returned?
12          A.   Yeah.  It seems like it.
13          Q.   Okay.  And this is the agreement --
14          A.   She has received -- she has sent me an
15    email by late October that she has received this one.
16          Q.   And subsequent to her receiving it --
17          A.   Through the mail.
18          Q.   You then received the payment?
19          A.   I don't know when the payment start, but --
20          Q.   Afterwards?
21          A.   -- it was much later than, I guess late,
22    late 2015, maybe December or something.  I don't
23    remember the exact date.
24               MS. PIERCE:  Okay.  All right.  We will go
25    ahead and take a lunch break now.  There are a number
```

**Page 69**

```
 1   of places nearby --
 2              THE REPORTER:  Do you want this on the
 3   record?
 4              MS. PIERCE:  We can go ahead off the
 5   record.
 6              VIDEOGRAPHER:  This is the end of file No.
 7   2 of the deposition of Mr. Kennedy.  We are off the
 8   record at 11:12 (sic) p.m.
 9              (Lunch recess taken from 12:11 to 1:07.)
10              VIDEOGRAPHER:  This is the beginning of
11   media No. 3 in the deposition of Mr. Kennedy.  We're
12   back on the record at 1:07 p.m.  You may proceed.
13        Q.   (BY MS. PIERCE)  Mr. Kennedy, I'm going to
14   ask you to keep Exhibit 9 in front of you, and then I'm
15   going to pass -- we're going to pass you what we'll
16   mark as Exhibit 10.
17              (Deposition Exhibit 10 was
18              marked for identification.)
19        Q.   (BY MS. PIERCE)  Let me know when you've
20   had a chance to review it.
21        A.   Okay.
22        Q.   All right.  So is this one of the modified
23   severance agreements that you sent to Andrea Wilson?
24        A.   Yeah, it seems like it's one of the
25   modifieds or amended ones.
```

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1          Q.   Is that your writing?

2          A.   Yeah, it seems like.

3          Q.   Okay.  And if you turn -- and is it true

4    that you were requesting 52 weeks of regular

5    compensation as your severance --

6          A.   Yeah, it seems like I crossed out, yes.

7          Q.   Okay.  So you wanted 52 weeks pay as your

8    severance sum, correct?

9          A.   Yeah, based on the previously promised or

10   in the previous agreements.

11         Q.   Okay.  So the previous agreements which you

12   had not signed, is that what you are referring to?

13         A.   Previous agreement that was presented by

14   the company to me.

15         Q.   The one you rejected, correct?

16         A.   Right.

17         Q.   All right.  So then at the bottom of --

18         A.   But there are other items here that I'm

19   demanding here.

20         Q.   Yeah, yeah.  So I wanted to ask you about

21   that.  So four pages in there is a section called

22   "Release of Claims."

23              Do you see that?

24         A.   Okay.

25         Q.   Okay.  And you understood that in order to

1    get your severance payment you would have to release a

2    lot of claims, correct?

3            A.    I am not a legal expert, so I didn't fully

4    understand that.  That's why I made the modification to

5    make sure --

6            Q.    Okay.

7            A.    -- the release of claims doesn't invade

8    those rights.

9            Q.    Okay.

10           A.    And I haven't consult this agreement,

11   specialized agreements attorney.  I have consulted with

12   employment discrimination, but not this one.  That's

13   why I amended myself.

14           Q.    Okay.  So you understood that you would be

15   releasing certain rights, or waiving certain rights.

16   But there were certain rights you wanted to make sure

17   wouldn't be waived by you signing this release,

18   correct?

19           A.    That wasn't clear.  That's why I send it

20   back with the amendments.

21           Q.    Right.  Because you wanted to make sure,

22   and you wrote at the bottom under the release of claims

23   section, "This agreement does not release any long-term

24   disability, ERISA claims, including current claims with

25   case numbers UNUM claims."

 1   through all these amendments, negotiations.

 2        Q.   Okay.  You wanted to get more money for

 3   your family?

 4        A.   Yes.  I wanted to get more because I --

 5   that's what they promised in the beginning, yeah.  36

 6   months.  I only took ten months out of it because of

 7   the work injury that was caused by the company's

 8   negligence.  So I couldn't get what's being promised to

 9   me in the first place.  I could only get the ten months

10   out of 36 months.

11        Q.   And you are referring to the earlier

12   agreement which you had rejected, correct?

13        A.   The earlier, the first conversation about

14   the closing.  During November, and then the 2000, 2013

15   late, 2013, and then the 2014 agreement.

16        Q.   Okay.

17        A.   Which I rejected.

18        Q.   All right.  Let's now go ahead and turn

19   your attention to exhibit No. 15?

20             MR. GOATLEY:  11.

21             MS. PIERCE:  Sorry, 11.

22             (Deposition Exhibit 11 was

23             marked for identification.)

24             THE WITNESS:  What am I looking at here?

25        Q.   (BY MS. PIERCE)  Okay.  So go ahead and go

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

 1   to the end.  It's sort of a chain of email.

 2              A.   On which page?

 3              Q.   From the second page in I think is the

 4   first email.  It's from you to Andrea Wilson dated June

 5   21st, 2015.

 6              A.   Okay.

 7              Q.   And you write, "Dear Andrea, I have

 8   received a new severance agreement through my Workers'

 9   Comp attorney."  So that new severance agreement that

10   you were referring to, is that the agreement that you

11   signed on October 20th, Exhibit 9?

12              A.   What's the date of the email?

13              Q.   June 21st.

14              A.   Which page?

15              Q.   The second-to-last page.  Oh, I'm sorry,

16   it's third-to-the-last, I'm sorry.  My apologies.

17              MR. GOATLEY:  There is a number at the

18   bottom that says 72; bottom right.

19              THE WITNESS:  July 6th?

20              Q.   (BY MS. PIERCE)  No, June 21st, just go

21   down the page a little bit.  June 21st at 8:20.  Starts

22   with "Dear Andrea."

23              Do you see a 72 at the very bottom of the

24   page?

25              A.   Okay, yeah.

 1          Q.   All right.  So you say, "Dear Andrea, I

 2   have received a new severance agreement through my

 3   Workers' Comp attorney."  Now that new severance

 4   agreement that you received through your Workers' Comp

 5   attorney, was that around June 2015?

 6          A.   I don't know the exact time.

 7          Q.   Okay.

 8          A.   It says June 21st, so it should be before.

 9          Q.   Okay.  And then you say, "Just to let you

10   know, Alexander Ennis is my Workers' Comp attorney but

11   not my employment attorney."

12          A.   Right.

13          Q.   Did you have an employment attorney at the

14   time?

15          A.   No.

16          Q.   Okay.  And then in the July 6th email to

17   Andrea you write, "Dear Andrea, I was hoping to connect

18   with you regarding this severance agreement offer but I

19   haven't heard from you.  I'm still hoping that we can

20   connect this week...I have no other option than

21   bringing my employment attorney to the table...next

22   week."

23              Which employment attorney were you

24   referring to?

25          A.   I don't hired.  I was just talking on the

1          Q.   And so all email -- all severance

2    negotiations were done in writing through email,

3    correct?

4          A.   Right.  And that's what I bring in my

5    terms, what I wanted.  And she, she didn't accept it.

6          Q.   All right.  So just so we're clear for the

7    record, the severance negotiations that took place all

8    took place via email, correct?

9          A.   Yes.  That's what I want to have.

10         Q.   Okay.  You said that there were other

11   versions with your proposed changes, other versions of

12   the severance agreement with your proposed changes.  So

13   let's take a look at what we're going to mark as 12.

14              (Deposition Exhibit 12 was

15              marked for identification.)

16              THE WITNESS:  This is the last -- there

17   should be one more version before this one.

18         Q.   (BY MS. PIERCE)  I'm not sure if I said

19   "last," but I did say "another."

20         A.   Okay.

21         Q.   So we can look to see if there is yet

22   another.

23              So again, these are your handwritten marks?

24         A.   Yeah.  This is what I signed on October

25   12th, the amendments.  That's what I sent to Andrea.

**Hakan Kip Kennedy**                    Kennedy vs. Columbus Manufacturing, Inc., et al.

 1              Q.    Okay.  Now at the top of this Exhibit 13

 2     Andrea Wilson writes, "Hello, Kip.  Our last offer to

 3     you was our final and best offer, and we will not be

 4     accepting any of your proposed modifications.  Whether

 5     or not you accept that final agreement is entirely up

 6     to you, but please remember that in order to receive

 7     the severance payments we have offered, you need to

 8     sign and return the revised agreement we sent you on

 9     August 27th, 2015, by no later than October 12th,

10     2015."

11                    Did you understand?

12              A.    Yeah, that's why I still sent her modified

13     version October 12th, so --

14              Q.    Okay.

15              A.    But she -- she rejected this one and the

16     one that I sent in the mail, or in the email, too.  So

17     like I said, she had the option not to -- to just cut

18     off at that point.  But she was persistent, more to go

19     through this severance agreement after October 12th.

20              Q.    Okay.  And so the reason you say that

21     you're signing the agreement that you signed

22     involuntarily was because it was less than you wanted,

23     correct?

24              A.    It was not what I wanted, not what I

25     wished.  And it couldn't meet the requirements of the

**Page 92**

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1    agreement.  I haven't received payments, I haven't -- I

2    didn't want to waive my rights.

3            Q.    Which payment have you not received?

4            A.    The holiday pays for -- I don't know the

5    exact hours, but --

6            Q.    You understood --

7            A.    -- holiday pay payments.

8            Q.    You understood that you were entitled to

9    get paid for holidays?

10           A.    Yeah, that's what it says.  And it wasn't

11   met, that October, because I didn't have the check yet.

12           Q.    Right.  But then you did receive a final

13   paycheck when?

14           A.    October 20th when my Workers' Comp

15   deposition.

16           Q.    Okay.  And it was on October 20th that you

17   signed the agreement, correct?

18           A.    I signed with the amendments.

19           Q.    No, no, no.  I mean when you received your

20   final payment from Ileana --

21           A.    Right.

22           Q.    -- it was on that same day that you signed

23   the severance agreement without the amendments?

24           A.    Is what she wanted through that email, she

25   insisted that I need to sign.  My copy all the original

```
 1                    THE WITNESS:  Okay.
 2                    VIDEOGRAPHER:  All right.  This is the end
 3    of media No. 3 in the deposition of Mr. Kennedy.  We're
 4    off the record at 2:03 p.m.
 5                    (Recess taken from 2:03 to 2:31.)
 6                    VIDEOGRAPHER:  This is beginning of file
 7    No. 4 in the deposition of Mr. Kennedy.  We're back on
 8    the record at 2:31 p.m.  You may proceed.
 9            Q.   (BY MS. PIERCE)  Mr. Kennedy, can you
10    please take a look at Exhibit 14.  We looked at that
11    email exchange between you and Andrea Wilson a little
12    while before the break.
13                    Do you recall it?
14            A.   Yes.
15            Q.   I wanted to ask you, was this the last
16    email exchange that you recall having with Andrea
17    Wilson following your acceptance of the severance
18    agreement?
19            A.   I need to see the previous email.
20            Q.   No, no, I'm sorry.  Do you recall any later
21    email exchanges with Andrea Wilson following the
22    acceptance of the severance agreement?
23            A.   Which email are you referring to?  I need
24    to see --
25            Q.   Anything.  So this one is dated October
```

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

 1   26th, 2015.  And it was an email from you to Andrea

 2   Wilson.  Do you remember sending her any later email

 3   after the time that you accepted the severance

 4   agreement?

 5          A.   I kind of remember she has sent me about

 6   payments or something like that.

 7          Q.   Okay.

 8          A.   But I don't remember exactly what it was.

 9   I need to see the email.

10          Q.   But you don't remember sending her any

11   other email --

12          A.   I don't.

13          Q.   -- after this one?

14          A.   I need to see the emails.

15          Q.   No.  My question, Mr. Kennedy, is do you

16   remember writing her an any other email after this

17   email?

18          A.   I don't remember.

19               MS. PIERCE:  Okay.  All right.  Let's take

20   a look at what we're going to mark as Exhibit 23.

21               (Deposition Exhibit 23 was

22               marked for identification.)

23          Q.   (BY MS. PIERCE)  You just a moment ago

24   referred to email that you believe may have been sent

25   regarding the actual payments of the severance.

**Hakan Kip Kennedy**                    Kennedy vs. Columbus Manufacturing, Inc., et al.

 1          A.   Right.

 2          Q.   Do you recall that?

 3          A.   That's regarding the payments, yeah.

 4          Q.   Is this the email that you are thinking of?

 5          A.   Yeah, it's related to that, yeah.

 6          Q.   Okay.

 7          A.   It's possibly this one.

 8          Q.   And you had agreed -- you had asked that

 9   your payments be sent in ten biweekly payments as

10   opposed to a lump sum, correct?

11          A.   Yeah, that's what it states.

12          Q.   Okay.  And then Andrea Wilson wrote back to

13   you and said that they were able to pay out the sum per

14   your request, correct?

15          A.   I didn't want a lump sum.

16          Q.   Right.  And they agreed to pay you

17   biweekly, correct?

18          A.   Yeah, some, a lump sum.

19          Q.   Yeah.

20          A.   Some -- due to the --

21          Q.   And is that how they paid you, biweekly,

22   with the severance payments?

23          A.   Yeah.

24          Q.   Okay.  Other than --

25          A.   I don't remember when were start, but

```
 1   emails say so.  (Clarification by the reporter.)  I

 2   don't remember when the payments were start, but the

 3   emails say so.

 4        Q.   Other than Andrea Wilson, did you negotiate

 5   with anyone else about the terms of your severance

 6   agreement?

 7        A.   No.  Because she was sending me all those

 8   agreements.

 9        Q.   Okay.  You took a leave of absence from

10   August 24th, I'm sorry, from August 2014 to August

11   2015, correct?

12        A.   August what?

13        Q.   August 20 -- August of 2014 to August of

14   2015?

15        A.   Where does it state that?

16        Q.   I'm sorry?

17        A.   Where does it state that, which --

18        Q.   Well, it's in some of the earlier exhibits

19   we looked at, I think.

20        A.   No, leave of absence stated several

21   different documents --

22        Q.   Several, right.

23        A.   -- distributed to different timeframes.

24        Q.   Is it your recollection that you were on a

25   leave of absence from August 2014 to August 2015?
```

**Hakan Kip Kennedy**            **Kennedy vs. Columbus Manufacturing, Inc., et al.**

1        A.    Like I said, it was different August to

2    first like November, and then from November to March,

3    March to whatever, May, May to then November 2015.  So

4    it was different timeframes, several.

5        **Q.    That's fair, okay.**

6        A.    Yeah.

7        **Q.    So when you connect your various leaves of**

8    **absence that were extended and they were multiple, when**

9    **you add them all together in a row, is it your best**

10   **recollection that you were out on a leave of absence**

11   **from August 2014 to August 2015?**

12       A.    No.  That's not the right question.  My

13   leave of absence finish by November something 2015.  So

14   the company terminated me whether I was send them leave

15   of absence or not, whether I was in medical leave or

16   not, they terminate me from the email, that's what it

17   says, by August 29.

18       **Q.    So you were on a leave of absence from at**

19   **least August 2014 to August 2015?**

20       A.    I was on leave of absence from August 29 to

21   November 2015, which is based on the leave of absence

22   request form which was sent to company.

23       **Q.    And that leave had commenced in August of**

24   **2014, correct?  That was first time you went out on**

25   **leave?**

1        A.    2014 it started.

2        Q.    Okay.

3        A.    But like I said, it was sent in May 2015,

4    that's extending medical leave until November 2015.

5        Q.    And during that time period that you were

6    on leave of absence you were receiving paid leave

7    benefits or disability benefits, correct?

8        A.    Yeah.   That's what the company has all the

9    documents.

10        MS. PIERCE:   I'm going to mark this next

11    one as Exhibit 24.

12        (Deposition Exhibit 24 was

13        marked for identification.)

14        Q.    (BY MS. PIERCE)   Do you recognize this?

15        A.    Yeah, seems like it.

16        Q.    This is an overview of your disability

17    payments, correct?

18        A.    Right.

19        Q.    And you were paid weekly while on

20    disability, correct?

21        A.    I'm not sure weekly or biweekly.   I'm not

22    sure about it, but it was probably biweekly.   But it

23    says weekly benefit amount, 1,075.

24        Q.    Were you receiving any additional form of

25    compensation during this time?

1          A.    During the State disability?

2          Q.    During this time -- during the time that

3     you were receiving these payments, were you receiving

4     any additional form of compensation?

5          A.    6/27 -- are you talking about the June

6     27th?

7          Q.    During -- during the period of time that

8     you were receiving disability payments were you

9     receiving any other type of payments?

10         A.    Like I've stated earlier, UNUM was making

11    payments on -- on top of whatever, 700 or $600.

12         Q.    And Columbus knew that you were receiving

13    disability and paid leave payments, correct?

14         A.    Yeah.  They had all the records of these

15    through their system.

16         Q.    And after you were laid off from Columbus

17    did you look for other employment?

18         A.    No, I cannot.

19         Q.    Can you take a look at Exhibit 9, please.

20    Okay.  Please take a look at section 1(a).

21         A.    Okay.

22         Q.    Now you were offered compensation for a sum

23    representing ten pay periods, correct?

24         A.    That's what it states here.

25         Q.    All right.  And in the version that you

1    version?

2         A.   I don't know what the reason.  Maybe they

3    were desperate for me to sign.

4         **Q.   Had you ever requested additional money?**

5         A.   I requested two years of payments and plus

6    some lump sum.  And then the one after, the one after

7    this one, I requested a year, not 20 weeks, 52 weeks of

8    --

9              So it was after this I went back here and

10   modified this agreement, which should be in September.

11   This is in August.  And then the one that I signed,

12   October 12th, is showing a different amount.

13              MS. PIERCE:  Okay.  Next we're going to

14   take a look at Exhibit 26.

15              (Deposition Exhibit 26 was

16              marked for identification.)

17              THE WITNESS:  Okay.

18         **Q.   (BY MS. PIERCE)  Okay.  So you were paid**

19   **for ten regular pay periods and received a bonus after**

20   **signing the severance agreement, correct?**

21         A.   Right.  That's what she said she's going to

22   execute.

23         **Q.   And that's what she did, right?**

24         A.   Yeah, four to six, is this four to six

25   weeks?  Six weeks before, and it's in middle November.

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

1              Q.   Okay.  So you were paid --

2              A.   11/13, through 11 -- something like that.

3    I received, I think, by the end of November, something

4    like that.

5              Q.   Okay.  So you received 10 regular pay

6    periods and then received a bonus after signing the

7    severance agreement?

8              A.   Yes, that's what she has executed, which I

9    have stated before that wasn't what I wished for or

10   what I wanted.

11             Q.   It wasn't as much as you wanted, correct?

12             A.   I believe I deserved more --

13             Q.   Okay.

14             A.   -- than what I have gone through.

15             Q.   So let me then ask you, you've previously

16   stated that you and other managers were informed that

17   you would lose your jobs as a result of the plant

18   closure in November 2013, correct?

19             A.   What's your question?

20             Q.   I know.  Let me -- this is what happens

21   when I cannot read writing.

22             All right.  Do you recall when we were

23   discussing around the Thanksgiving discussion in 2013

24   when you and other managers were told that you would be

25   losing your jobs as a result of the plant closure?

```
 1   give if exact date.  They just referred it to further,
 2   in a few years, 36 months, whatever --
 3         Q.   Okay.
 4         A.   -- timeframe.  But they told this will be
 5   partially closed first, the daily operations, and then
 6   the salami.
 7         Q.   So the timing wasn't made specific until
 8   early 2014?
 9         A.   Right.  That was being officially announced
10   by Ken Neishi and president of the company, maybe.  I
11   remember Ken Neishi.  But it was, I guess, spring 2014.
12              MS. PIERCE:  We're going to mark this next
13   one as Exhibit 27.
14              (Deposition Exhibit 27 was
15              marked for identification.)
16              THE WITNESS:  Okay.
17         Q.   (BY MS. PIERCE)  Do you recall that email
18   exchange with --
19         A.   Yes, seems familiar.  (Clarification by the
20   reporter.)  Yes, it seems familiar.
21              MS. PIERCE:  Okay.  This next one we're
22   going to mark as 28.
23              (Deposition Exhibit 28 was
24              marked for identification.)
25              THE WITNESS:  Okay.
```

**Hakan Kip Kennedy**          Kennedy vs. Columbus Manufacturing, Inc., et al.

1          Q.    (BY MS. PIERCE)  Okay.  And I want to ask

2   you, your email to Andrea dated August 28th, 2015, at

3   1:38 p.m., did you draft that email?

4          A.    August 28th --

5          Q.    On the first page, August 28th, 2015, at

6   1:38 p.m.

7          A.    This one?  Yes, August.

8          Q.    Did you -- I'm sorry, did you draft that?

9          A.    I'm not aware it's August 28th.

10          Q.    August -- on the first page, the very first

11   page.

12          A.    It says July 10th, and this is September

13   23rd.

14          Q.    Maybe you are on the wrong one.  Are you on

15   Exhibit 28?  Are you looking at Exhibit 28?

16               MR. GOATLEY:  Further down on that exhibit

17   you have your hand on.

18               THE WITNESS:  Oh, okay.  Yeah, it's --

19          Q.    (BY MS. PIERCE)  So that was confusing.  So

20   there is actually three emails from you.  One -- maybe

21   more than that.  Okay.  Let's see here.  So you sent an

22   email to Andrea Wilson on Friday, 20 -- Friday, August

23   28th, 2015, at 1:38 p.m.  Also you sent one Tuesday,

24   September 15th, 2015, at 11:23 a.m.  And you also sent

25   one on September 23rd, 2015, at 8:47 p.m.

**Page 116**

Hakan Kip Kennedy                    Kennedy vs. Columbus Manufacturing, Inc., et al.

```
 1              And my question with respect to all three
 2    of those emails is the same.  Did you draft those
 3    emails to Andrea?
 4          A.   Yeah.  That shows my name, yes.
 5               MS. PIERCE:  Okay.  Next up is Exhibit 29.
 6               (Deposition Exhibit 29 was
 7               marked for identification.)
 8          Q.   (BY MS. PIERCE)  Do you recognize these
 9    email exchanges with Andrea Wilson?
10          A.   Yeah, it seems familiar.
11               MS. PIERCE:  This next one is Exhibit 30.
12               (Deposition Exhibit 30 was
13               marked for identification.)
14          Q.   (BY MS. PIERCE)  For the sake of
15    completeness, that's also a leave request form
16    completed by you?
17          A.   This one?
18          Q.   Yes.
19          A.   Yes.
20               MS. PIERCE:  And similarly, same question
21    with respect to Exhibit 31.
22               (Deposition Exhibit 31 was
23               marked for identification.)
24          Q.   (BY MS. PIERCE)  Was that form completed by
25    you?
```

**Hakan Kip Kennedy**                              **Kennedy vs. Columbus Manufacturing, Inc., et al.**

```
 1                   CERTIFICATE OF REPORTER

 2          I, the undersigned, a Certified Realtime

 3     Reporter of the State of California, do hereby certify:

 4          That the foregoing proceedings were taken

 5     before me at the time and place herein set forth; that

 6     any witnesses in the foregoing proceedings, prior to

 7     testifying, were duly sworn; that a record of the

 8     proceedings was made by me using machine shorthand,

 9     which was thereafter transcribed under my direction;

10     that the foregoing transcript is a true record of the

11     testimony given.

12          Further, that if the foregoing pertains to the

13     original transcript of a deposition in a federal case,

14     pursuant to Rule 30(e)(2), before completion of the

15     proceedings, review of the transcript [ X ] was [ ] was

16     not requested.

17          I further certify I am neither financially

18     interested in the action nor a relative or employee of

19     any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21     subscribed my name.

22          Dated:  January 8, 2018

23

24     _____

25     DIANE M. WINTER, RMR, CRR, CSR NO. 3186
```

**Page 151**

May 5, 2014

Hakan Kip Kennedy
832 Derry Circle
Vacaville, CA 95688

Dear Kip:

As has been discussed, your employment with Columbus Manufacturing, Inc. ("Columbus" or the "Company") will end on the targeted date of August 29, 2015 (the "Separation Date"). Provided you accept it, this Transition and Severance Agreement letter ("Agreement") constitutes the agreement between you and the Company concerning your Transition Period and eventual separation from the Company.

The Transition Period is defined as the period between when this letter is executed and your Separation Date. During this Transition Period, we expect you to continue with your assigned duties and responsibilities in aiding the Company to a successful plant expansion.

The Separation Date is defined as your targeted termination date. The Company has the right to alter the Separation Date, if necessary, driven by business needs. We will make all efforts to communicate this to you in writing no later than 60 days before the actual Separation Date.

You have been a valued and trusted employee and as a reward for the work you have done and as a retention effort to maintain your talent in the work that you will do through the Transition Period, the Company is presenting a two part retention bonus (see section 1 of this Agreement).

    1.    Transition:  The period from the date you sign this letter through the Separation Date will be known as the "Transition Period." On the "Transition Date", July 4, 2014, you will receive any salary earned during the previous payroll periods of your employment, through the Transition Date, to the extent any such salary remains unpaid. Provided the Company is in receipt of a signed copy of this Agreement from you and it is post-marked no later than June 20, 2014, and provided that you do not voluntarily quit your employment prior to the end of the Transition Period, get terminated by the Company for cause prior to the end of the Transition Period, accept another position of employment with the Company or any other affiliate or subsidiary of Columbus Manufacturing during the Transition Period, or materially breach this Agreement, the Company agrees to provide you with the following "Transition Package":(i) your regular compensation, less any lawful deductions during the Transition Period; and (ii) if you are enrolled in the Company's group health and dental plans as of the Transition Date, your enrollment will continue through the Transition Period. As a condition of your eligibility to receive these payments during the Transition Period, you will be expected during the Transition Period to continue to perform at an acceptable level the regular duties of your position, unless otherwise directed by the Company, and to perform at an acceptable level such other duties as



Exhibit: _5_
Witness: _Kennedy_
Date: _12·28·17_

the Company may request from time to time and to cooperate fully with the Company to assure a smooth transition of your duties by the Separation Date. You will become ineligible to continue receiving payments during the Transition Period if prior to the end of the Transition Period you commit any action that results in termination for cause, including, but not limited to, failure to perform your duties at an acceptable level in the sole discretion of the Company. In addition, provided that the Company is in receipt of a signed copy of this Agreement from you by June 19, 2014, the Company will pay you a Transition Period Bonus of ████████ minus lawful deductions, on July 4, 2014, the Transition Date. This represents 30% of the full Transition Period Bonus.

This provision and the Agreement do not modify or alter the at-will status of your employment with the Company and you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, for any reason, with or without cause, and with or without prior notice.

2.   <u>Additional Transition Period Bonus</u>:   If, in addition to fulfilling all of your obligations under this Agreement, you: (i) sign and return to the Company Addendum A between August 29, 2015 and October 13, 2015; (ii) you do not voluntarily quit your employment prior to the end of the Transition Period, get terminated by the Company for cause prior to the end of the Transition Period; and (iii) you do not accept another position of employment with the Company or any other affiliate or subsidiary of Columbus Manufacturing during the Transition Period, then the Company will pay you an additional Transition Period Bonus of $10,762.49, minus lawful deductions. This represents the remaining 70% of the full Transition Period Bonus.

3.   <u>Severance</u>: If, in addition to fulfilling all of your obligations under this Agreement, including remaining employed with the Company through the Transition Period, you sign Addendum A between August 29, 2015 and October 13, 2015, then the Company will provide you with the following:

(a)   A severance sum of ████████ representing 10 weeks of your regular compensation, less any lawful deductions ("Severance Benefits"), upon the terms and conditions set forth herein. The Severance will be paid to you in regular installments based on the Company's regular pay cycle (the "Severance Pay Period"). Provided, however, that if during the Severance Pay Period you become employed by Columbus Manufacturing or any affiliate or subsidiary of Columbus Manufacturing, performing duties similar to those performed by you for the Company, you will not be eligible to continue receiving Severance payments. You acknowledge and agree that you would not otherwise be entitled to Severance but for your execution of this Agreement and of Addendum A to this Agreement. You acknowledge and agree that this Severance is not required by the Company's policies and procedures or by any prior agreement between the Company and its Employees.

(b)   If you are enrolled in the Company's group health and dental plans on the Separation Date and elect to continue your coverage and that of your eligible dependents in those plans under the federal law known as the Consolidated Omnibus Budget Reconciliation Act of 1986 (commonly referred to as "COBRA") by enrolling in COBRA in a timely manner, then, until the end of the Severance Pay Period or, if sooner, until the date you become eligible to

2

enroll in the group health plan of another employer, the Company will contribute to the premium cost of that coverage the same amount that it contributes for coverage of its active employees and their eligible dependents under those plans. In order to be eligible for those Company contributions, however, you must pay the remainder of the premium cost by authorized payroll deduction and you also must notify the Chief People Officer, immediately if you become eligible to enroll in a group health plan through another employer during the Severance Pay Period and repay promptly any excess contributions made by the Company hereunder. After the Company contributions end, you may continue coverage under the Company's group health and dental plans for the remainder of the COBRA period, if any, by paying the full premium cost plus any generally required administrative fee.

4.    <u>Affirmations</u>:  You represent and affirm that you have been paid and/or received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which you may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due you through the start of the Transition Period.  You also represent and affirm that you reported to the Company any and all work-related injuries incurred by you during your employment by the Company and have been properly provided any leave of absence because of your or your family member's health condition and affirm that you have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave.

5.    <u>Timing of Payment</u>:  The Company will begin remitting the Severance payments to you via direct deposit within fifteen business (15) days of the Separation Date, provided it is in receipt of a signed copy of this Agreement and Addendum A to this Agreement.  The signed Addendum A must be post-marked no later than October 13, 2015.

6.    <u>Withholding</u>.  All payments by the Company under this Agreement will be reduced by all taxes and other amounts that the Company is required to withhold under applicable law and all other deductions authorized by you.

7.    <u>Acknowledgement of Full Payment</u>.  You acknowledge and agree that payment by the Company in accordance with this Agreement shall be in complete satisfaction of any and all sums that are now or might hereafter have become owing to you for services rendered by you during the Transition Period.

8.    <u>Status of Paid Time Off and Employee Benefits</u>.  You will not continue to earn vacation or other paid time off after the date your employment terminates and, except for any right that you have to continue participation in the Company's group health and dental plans through COBRA, your participation in all employee benefit plans of the Company will end as of the Separation Date, in accordance with the terms of those plans.

9.    <u>Continuing Obligations</u>.  The following obligations shall not only apply after the effective date of this Agreement, but also, during the period from the date you receive this Agreement until its effective date, are a condition of your eligibility to accept this Agreement:

3

(a) <u>Confidentiality</u>.  You agree that you will continue to protect Confidential Information, as defined below, and also agree that you will never, directly or indirectly, use or disclose it, other than as required for the proper performance of your regular and transitional duties for the Company during the remainder of your employment or as required by applicable law or legal process after prompt notice to the Chief People Officer and a reasonable opportunity for the Company to seek protection of the Confidential Information prior to your disclosure. In addition, you agree that you will not disclose this Agreement or any of its terms or provisions, directly or by implication, except (i) to members of your immediate family and to your legal, tax and other professional advisors, and then only on condition that they agree not to further disclose this Agreement or any of its terms or provisions to others; (ii) as required by applicable law or by court order or other legal process or at the request of federal or state tax authorities; and (iii) to any actual and prospective employer or any other entity for whom you intend or propose to provide services, to inform them of your continuing obligations to the Company under this Section.  Nothing in this paragraph is intended to preclude the parties from disclosing the existence and terms of this Agreement as necessary to enforce its terms or in connection with a claim for breach of this Agreement or from participating in any investigation by any government entity into employment, ethics, or compliance issues.  Your obligations under this Section 9(a) will continue to apply so long as there is Confidential Information.

(b) <u>Obligation Not to Disparage</u>.  You agree that during the remainder of your employment and thereafter, you will not directly or indirectly engage in any conduct that will disparage, denigrate, or discredit the Released Parties, as defined below.

(c) <u>Return of Documents and Disclosure of Passwords</u>.  You agree to return to the Company, no later than the Separation Date and at such earlier time or times as the Company may specify, any and all documents, materials and information related to the business, whether present or otherwise, of the Company or any of the other Affiliates, and all copies thereof, and all keys and other property of the Company and the other Affiliates then in your possession or control.  Recognizing that your employment is ending, you agree that, following termination of your employment, you will not, for any purpose, attempt to access or use any computer or computer network or system of the Company or any of the other Affiliates.  Further, you agree to disclose to the Company no later than the last day of your employment and at such earlier time or times as the Company may specify, all passwords necessary or desirable to enable the Company to access any and all information that you have password-protected on its computer network or system or that of any of the other Affiliates.

(d) <u>Cooperation</u>.  You agree to cooperate with the Company during the Transition Period and thereafter with respect to all matters arising during or related to your employment with either of them, including without limitation to all matters in connection with any governmental investigation, litigation or regulatory or other proceeding that may have arisen or that may arise following the signing of this Agreement.  The Company will pay any out-of-pocket expenses you incur in the course of any requested cooperation, if approved in advance.  Should this require your time after the Transition Period, you will be compensated at a reasonable mutually agreed upon rate, exclusive of time, if any, spent testifying as a fact witness at any legal proceeding, and, exclusive of your obligations to testify at any legal proceeding, your meetings and other communications will take place at mutually agreed times and places.

4

10.    <u>Definitions</u>.  As used in this Agreement:

"Affiliates" means any and all Persons with whom the Company has or had a management or advisory contract or relationship during the term of your employment, any entities in which any such Person had an equity investment (other than a public company in which such Persons do not, in the aggregate, own a controlling interest) and any Persons directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

"Confidential Information" means any and all information of the Company and the other Affiliates that is not generally known to those Persons with whom any of them competes or does business or with whom any of them plans to compete or do business. Confidential Information also includes any and all other information received by the Company or any of the other Affiliates from any other Person with any understanding, express or implied, that the information would not be disclosed.  Confidential Information does not include information that is in the public domain or enters the public domain other than through your breach of this Agreement or a breach by you or any other Person of a duty of confidentiality owed to the Company or any of the other Affiliates.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership (including a limited partnership), an estate, a trust or any other entity or organization.

11.    <u>Release of Claims</u>.

(a)    The Company wants to be certain that this Agreement will resolve any and all concerns that you might have and therefore requests that you carefully consider its terms, including the release of claims contained in Section 11(c) below.   This Agreement creates legally-binding obligations and the Company therefore advises you to consult an attorney before you sign it.

(b)    You understand that you may consider this Agreement for up to forty-five (45) days before deciding whether to sign it.  If you sign this Agreement before the expiration of that forty-five (45) day period, you acknowledge that such decision was entirely voluntary.  You understand that if you do not sign and return this Agreement to the Company's Chief People Officer by the end of that forty-five (45) day period, the offer of a Transition Package, including Transition Bonuses and Severance will expire.  You also understand that for a period of seven (7) days after you execute this Agreement, you have the right to revoke it by a written notice to be received by the Company's Chief People Officer by the end of that period.  You also understand that this Agreement shall not be effective or enforceable until the expiration of that period.  You further represent and agree that you carefully read and fully understand all of the provisions of this Agreement and that I am voluntarily agreeing to those provisions.

(c)    In consideration for the payments set forth in this Agreement and other terms of this Agreement, except for the rights and the obligations created by this Agreement,

5

Employee on Employee's own behalf and on behalf of Employee's heirs, beneficiaries, executors, administrators, representatives and assigns, and all others connected with or claiming through Employee, Employee hereby fully, finally and completely release and forever discharge, acquit, relinquish and hold harmless the Company and the other Affiliates and all of their respective past, present and future officers, directors, shareholders, general and limited partners, joint venturers, members, managers, employees, agents, predecessors, successors and assigns, and all other Persons connected with any of them (all, collectively, the "Released Parties"),  both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, arising from facts or events occurring on or before the effective date of this Agreement.  The foregoing release covers, without limitation, any and all claims arising from or related to your employment with the Released Parties such as claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq; the California Labor Code; any offer of employment letter, employee manual or handbook, or written employment agreement; other federal, state or local statute, ordinance, order and regulation and common law; negligence, gross negligence personal injury and/or tortious conduct; all tort, intentional tort, and contract (express or implied) claims; any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make the Agreement not binding; and all other claims or causes of action whatsoever which you may have now or in the future arising out of your employment relationship with the Released Parties, or otherwise, whether presently known or unknown, against the Released Parties on or before the time of your execution of this Agreement.  Additionally, this release excludes any claim that cannot be released by private agreement.

      (d)   <u>Full Release</u>: Further, in signing this Agreement, which includes the release of claims set forth in the paragraph above ("Claims"), you represent that you are doing so with full knowledge of any and all rights which you have and that you have not relied on any representations made by the Company with regard to this Agreement.  You expressly waive and relinquish all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and does so understanding and acknowledging the significance of such a specific waiver of Section 1542, which section states as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Released Parties, you expressly acknowledge that this Agreement and the release of claims included in it is intended to include in its effect, without limitation, all Claims which you do not know or suspect to exist in your favor at the time of execution hereof, and that this Agreement and such  release of claims contemplate the extinguishment of all such Claims.

6

12.  <u>Severance Program Disclosure</u>.  You acknowledge that, if you are age 40 or over, the Company provided you a document entitled "Disclosure of Information Related to Severance Program" on the same date that you received this General Release.

13.  <u>Miscellaneous</u>.  The validity of this Agreement shall be construed under California law.  The parties agree that this Agreement supersedes any and all prior agreements or understandings, written or oral, pertaining to Employee's employment and its termination and all related matters excluding only agreements between Employee and the Company or any of the other Affiliates with respect to confidentiality, non-solicitation of clients or employees or other restrictions and loans, if any, to Employee from the Company or any of the other Affiliates, or from any of their respective employee benefits plans, that are outstanding on the date you sign this Agreement, all of which shall continue in full force and effect in accordance with their terms.  No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist.  This Agreement cannot be changed orally, but may be changed only through written addendum executed by all parties.  This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Company.  The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

14.  <u>Assurances</u>:  In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms and that you have had a full and sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney or any of the other Persons listed in the second sentence of Section 9(a) of this Agreement, should you wish to do so; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

15.  <u>Complete Terms</u>:  This Agreement sets forth the final and complete terms of the agreement between Employer and Employee regarding Employee's termination of employment, and any compensation or other alleged or potential claims of Employee against Employer, asserted or unasserted.

*[Remainder of page intentionally blank.  Signature page follows immediately.]*

Hakan Kip Kennedy has read and understands the Agreement set forth above.  Employee accepts the consideration stated above and agrees to be bound by the terms of this Agreement.

Formalities aside, I want to thank you on behalf of the Company for your service and to wish you well in your future career.

Sincerely,

Andrea Wilson
Chief People Officer

Accepted and agreed:

Signature: _____

Name (please print): _____

Date: _____

8

ADDENDUM A TO THE TRANSITION AND SEVERANCE AGREEMENT AND RELEASE

In consideration of the benefits described in paragraphs 2 and 3 of the Agreement, I, Hakan Kip Kennedy, hereby agree as follows:

1.      I waive and release, to the greatest extent permitted by law, the Company and its subsidiaries and affiliated companies, and all of their respective agents, employees, officers, directors, shareholders, successors, and assigns ("Released Parties") from any and all claims I have or may have related to my employment and any and every other matter or thing arising at time up to and including the date of this Addendum A to the Agreement. I have not filed and will not file any lawsuit, claim or charge against the Released Parties relating to my employment or any other matter up to the date this Agreement becomes effective.

2.      I hereby waive the rights and benefits conferred by section 1542 of the California Civil Code with respect to the time period between the effective date of the Release and the date I sign this Addendum. I understand that section 1542 provides:

        A general release does not extend to claims which the creditor does not know
        or suspect to exist in his or her favor at the time of executing the release, which if known
        by him or her must have materially affected his or her settlement with the debtor.

3.      I understand that this Addendum release does not apply to any claims or rights that may arise after the date that I signed this Addendum, the consideration for this Addendum, the Company's expense reimbursement policies, vested rights under the Company's ERISA-covered employee benefit plans as applicable on the date I sign this Addendum, and any claims that the controlling law clearly states may not be released by settlement including, but not limited to, claims for indemnity for necessary expenses or losses (e.g., reimbursement of business expenses) incurred on behalf of the Company as provided in California Labor Code section 2802. I also understand that in the event Citigroup or the Company or its affiliates reemploy me during the period for which the Severance is being paid, I agree that the Company may withhold any remaining portion of my Severance. Notwithstanding the foregoing, this provision does not apply to me providing any consulting services as an independent contractor.

4.      I represent and affirm that I have been paid and/or received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which I may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due me through the Separation Date. I represent and affirm that I have reported to the Company any and all work-related injuries incurred by me during my employment by the Company and has been properly provided any leave of absence because of the my or my family member's health condition and have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave.

5.      I represent that I have been given at least 45 days to consider the terms of this Addendum before signing it. I knowingly and voluntarily waive the remainder of the 45-day consideration period, if any; following the date I sign this Addendum. I have not been asked by the Company

9

to shorten my time-period for consideration of whether to sign this Addendum. The Company has not threatened to withdraw or alter the benefit due to me prior to the expiration of the 45-day period nor has the Company provided different terms to me because I have decided to sign this Addendum prior to the expiration of the 45-day consideration period. I understand that having waived some portion of the 45-day consideration period, the Company will expedite the processing of benefits provided to me in exchange for signing this Addendum.

6.      I acknowledge and agree that payments by the Company in accordance with the Agreement and this Addendum shall be in complete satisfaction of any and all sums that are now or might hereafter have become owing to me for services rendered by me during my employment with the Company or any of the other Affiliates (as hereafter defined), through my Transition Period and my final separation from the Company.

7.      I understand that if I sign this Addendum, I can change your mind and revoke it within seven days (7) after signing it by returning it with written revocation notice to Chief People Officer, Andrea Wilson. I further understand and acknowledge that the release and waiver set forth above will not be effective until after this seven-day period has expired, and I will receive no benefits until the eighth day after I sign this Addendum. I understand that if I do not revoke this Agreement, then, at the expiration of that seven-day period, this letter will take effect as a legally-binding agreement between me and the Company on the basis set forth above.

I agree with the Company that changes, whether material or immaterial, do not restart the running of the 45-day consideration period.

7.      I have not signed this Addendum prior to October 13, 2015.

DATED: _____          _____

                                                                            Hakan Kip Kennedy

## Disclosure of Information Related to Severance Program

Columbus Manufacturing, Inc. ("Columbus" or the "Company") is terminating your employment as part of a reduction in force. The Company is offering each employee who will be laid off as part of this reduction in force the opportunity to receive certain "Transition Package", "Transition Period Bonuses" and "Severance Benefits," as defined in the Transition and Severance Agreement ("Agreement"), in exchange for, among other terms, the affected employee's agreement to release any and all legal claims he or she may have against the Company. The release of legal claims is set forth in the Agreement accompanying this disclosure document.

Under the federal Age Discrimination in Employment Act ("ADEA"), employees age 40 or over who are offered severance pay in exchange for releases of legal claims as part of a standard program are entitled to receive certain information related to the program. This document provides that required information.

1. **Eligibility for Severance**: All persons being laid off as part of the current reduction in force are eligible for Severance Benefits.

2. **Time Limits for Decisions:** All persons who are being offered Severance Benefits must sign the Company's proposed general release and return it to the Human Resources Department. Employees may take up to 45 days after receiving the general release to sign and return it. Once the general release has been signed, Employee may revoke the agreement within seven days of signing.

3. **Factors Considered in Selection Decisions:** Employees were selected for the current reduction in force based on the Company's assessment of its business needs. In some circumstances, positions were eliminated without retaining employees who performed similar functions. In other circumstances, the Company selected positions for elimination from among individuals performing similar functions. The considerations that the Company used when selecting from among individuals who performed similar functions were its assessments of skills, knowledge, experience, responsibilities and job performance in light of the Company's business needs.

4. **Listing of Persons Selected and Not Selected:** Under ADEA, employees who are age 40 or over are entitled to certain information about other employees who are being laid off and are being offered Severance Benefits. The information to be provided covers all persons in the "decisional unit" for the current reduction in force. The "decisional unit" is the portion of the Company's organization from which the Company decided who would be selected for the reduction in force and therefore offered Severance Pay and who would not. The decisional unit is the Operations group of the Company. The following lists the ages and job titles of all persons in the decisional unit who were and were not selected for the reduction in force and Severance Benefits eligibility:

11

| Job Title | Age | No. Selected | No. Not Selected |
|---|---|---|---|
| Associate Director, Co-Manufacturing | 49 | 0 | 1 |
| Associate Director, Engineering | 38 | 0 | 1 |
| Director of Engineering | 43 | 0 | 1 |
| Director of Quality Assurance | 54 | 0 | 1 |
| Facilies Engineer | 60 | 1 | 0 |
| Maintenance Manager | 39 | 0 | 1 |
| Maintenance Manager | 50 | 0 | 1 |
| Plant Manager I | 63 | 1 | 0 |
| Plant Manager I | 46 | 0 | 1 |
| Plant Manager II | 56 | 0 | 1 |
| QA Plant Manager I | 34 | 0 | 1 |
| QA Plant Manager I | 34 | 0 | 1 |
| QA Plant Manager II | 44 | 1 | 0 |
| QA Plant Manager II | 64 | 0 | 1 |
| Sr. Mgr, Environ Comp, Infrastructure, Safety | 45 | 0 | 1 |

Date:  May 5, 2014

12

Message

| | |
|---|---|
| **From:** | Andrea Wilson [awilson@COLUMCO.COM] |
| **Sent:** | 6/19/2014 12:47:13 PM |
| **To:** | Kip Kennedy [kkennedy@columco.com] |
| **Subject:** | RE: Retention/Severance Agreement |

Great.  Call me on  .  Thanks Kip.  Hoping I can clear a few points up for you.

**From:** Kip Kennedy
**Sent:** Thursday, June 19, 2014 12:23 PM
**To:** Andrea Wilson
**Subject:** RE: Retention/Severance Agreement

Hi Andrea,

How about 2:00pm, Would that be OK?

Thanks
Kip

**From:** Andrea Wilson
**Sent:** Thursday, June 19, 2014 10:22 AM
**To:** Kip Kennedy
**Subject:** RE: Retention/Severance Agreement

Kip,

Thanks for reaching out to me.  I am not understanding what you are referring to here.

I am available today if you would like to talk by phone.  Can you give me a time where you can talk?

**From:** Kip Kennedy
**Sent:** Thursday, June 19, 2014 8:25 AM
**To:** Andrea Wilson
**Cc:** Paul Wolfert; Ken Neishi
**Subject:** Retention/Severance Agreement

Dear Andrea,

Due to health issues, I will not be able to sign the agreement that you have presented to me; in order not to waive my rights on medical, life and disability insurance. But I am planning to work and stay with the company until the end of summer 2015. Can we please talk about severance agreement during summer 2015?
Your understanding is highly appreciated.

Respectfully
KIP KENNEDY | FORBES QA MANAGER
**COLUMBUS FOODS**

TEL 510.921.3400 | MOBILE 650 483 1599
493 Forbes Blvd, South San Francisco CA 94080
kkennedy@columco.com
http://www.ColumbusSalame.com

Exhibit: 6
Witness: *Kennedy*
Date: 12·28/7

DEF000112

August 27, 2015

Hakan Kip Kennedy
832 Derry Circle
Vacaville, CA 95688

Dear Kip:

As has been discussed, your employment with Columbus Manufacturing, Inc. ("Columbus" or the "Company") will end on August 29, 2015 (the "Separation Date"). Provided you accept it, this Severance Agreement letter ("Agreement") constitutes the agreement between you and the Company concerning your separation from the Company.

The Separation Date is defined as your termination date. The Company has the right to alter the Separation Date, if necessary, driven by business needs.

    **1.**    <u>Severance</u>: If, in addition to fulfilling all of your obligations under this Agreement, you sign and return this Agreement by October 12, 2015, then the Company will provide you with the following:

        (a)    a severance sum of ███████ representing 10 pay periods (20 weeks of pay) of your regular compensation, and an additional sum of ███████ less any lawful deductions ("Severance Benefits"), upon the terms and conditions set forth herein. The Severance will be paid to you in one lump sum. You acknowledge and agree that you would not otherwise be entitled to Severance but for your execution of this Agreement. You acknowledge and agree that this Severance is not required by the Company's policies and procedures or by any prior agreement between the Company and its Employees.

    **2.**    <u>Affirmations</u>: You represent and affirm that you have been paid and/or received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which you may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due to you. You also represent and affirm that you reported to the Company any and all work-related injuries incurred by you during your employment by the Company and have been properly provided any leave of absence because of your or your family member's health condition and affirm that you have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave.

    **3.**    <u>Timing of Payment</u>: The Company will begin remitting the Severance payments to you via direct deposit within fifteen business (15) days of the Separation Date, provided it is in

*@ptus*
COURT REPORTING

Exhibit: _9_
Witness: _Kennedy_
Date: _12·28·17_

1

DEF000057

receipt of a signed copy of this Agreement and that it has not been revoked. The signed Agreement must be post-marked no later than October 12, 2015.

    <u>4.</u>    <u>Withholding.</u> All payments by the Company under this Agreement will be reduced by all taxes and other amounts that the Company is required to withhold under applicable law and all other deductions authorized by you.

    <u>5.</u>    <u>Acknowledgement of Full Payment.</u> You acknowledge and agree that payment by the Company in accordance with this Agreement shall be in complete satisfaction of any and all sums that are now or might hereafter have become owing to you for services rendered by you.

    <u>6.</u>    <u>Status of Paid Time Off and Employee Benefits.</u> You will not continue to earn vacation or other paid time off after the date your employment terminates and, except for any right that you have to continue participation in the Company's group health and dental plans through COBRA, your participation in all employee benefit plans of the Company will end as of the Separation Date, in accordance with the terms of those plans.

    <u>7.</u>    <u>Continuing Obligations.</u> The following obligations shall not only apply after the effective date of this Agreement, but also, during the period from the date you receive this Agreement until its effective date, and are a condition of your eligibility to accept this Agreement:

    <u>(a)</u>    <u>Confidentiality.</u> You agree that you will continue to protect Confidential Information, as defined below, and also agree that you will never, directly or indirectly, use or disclose it, other than as required for the proper performance of your regular duties for the Company during the remainder of your employment or as required by applicable law or legal process after prompt notice to the Chief People Officer and a reasonable opportunity for the Company to seek protection of the Confidential Information prior to your disclosure. In addition, you agree that you will not disclose this Agreement or any of its terms or provisions, directly or by implication, except (i) to members of your immediate family and to your legal, tax and other professional advisors, and then only on condition that they agree not to further disclose this Agreement or any of its terms or provisions to others; (ii) as required by applicable law or by court order or other legal process or at the request of federal or state tax authorities; and (iii) to any actual and prospective employer or any other entity for whom you intend or propose to provide services, to inform them of your continuing obligations to the Company under this Section. Nothing in this paragraph is intended to preclude the parties from disclosing the existence and terms of this Agreement as necessary to enforce its terms or in connection with a claim for breach of this Agreement or from participating in any investigation by any government entity into employment, ethics, or compliance issues. Your obligations under this Section 7(a) will continue to apply so long as there is Confidential Information.

    <u>(b)</u>    <u>Obligation Not to Disparage.</u> You agree that during the remainder of your employment and thereafter, you will not directly or indirectly engage in any conduct that will disparage, denigrate, or discredit the Released Parties, as defined below.

2

DEF000058

(c)   Return of Documents and Disclosure of Passwords. You agree to return to the Company, no later than the Separation Date and at such earlier time or times as the Company may specify, any and all documents, materials and information related to the business, whether present or otherwise, of the Company or any of the other Affiliates, and all copies thereof, and all keys and other property of the Company and the other Affiliates then in your possession or control. You agree that, following termination of your employment, you will not, for any purpose, attempt to access or use any computer or computer network or system of the Company or any of the other Affiliates. Further, you agree to disclose to the Company no later than the last day of your employment and at such earlier time or times as the Company may specify, all passwords necessary or desirable to enable the Company to access any and all information that you have password-protected on its computer network or system or that of any of the other Affiliates.

(d)   Cooperation. You agree to cooperate with the Company during your employment and thereafter with respect to all matters arising during or related to your employment, including without limitation to all matters in connection with any governmental investigation, litigation or regulatory or other proceeding that may have arisen or that may arise following the signing of this Agreement. The Company will pay any out-of-pocket expenses you incur in the course of any requested cooperation, if approved in advance. Should this require your time after your Separation Date, you will be compensated at a reasonable mutually agreed upon rate, exclusive of time, if any, spent testifying as a fact witness at any legal proceeding, and, exclusive of your obligations to testify at any legal proceeding, your meetings and other communications will take place at mutually agreed times and places.

8.   Definitions. As used in this Agreement:

"Affiliates" means any and all Persons with whom the Company has or had a management or advisory contract or relationship during the term of your employment, any entities in which any such Person had an equity investment (other than a public company in which such Persons do not, in the aggregate, own a controlling interest) and any Persons directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

"Confidential Information" means any and all information of the Company and the other Affiliates that is not generally known to those Persons with whom any of them competes or does business or with whom any of them plans to compete or do business. Confidential Information also includes any and all other information received by the Company or any of the other Affiliates from any other Person with any understanding, express or implied, that the information would not be disclosed. Confidential Information does not include information that is in the public domain or enters the public domain other than through your breach of this Agreement or a breach by you or any other Person of a duty of confidentiality owed to the Company or any of the other Affiliates.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership (including a limited partnership), an estate, a trust or any other entity or organization.

3

DEF000059

9.   Release of Claims.

(a)   The Company wants to be certain that this Agreement will resolve any and all concerns that you might have and therefore requests that you carefully consider its terms, including the release of claims contained in Section 9(c) below. This Agreement creates legally-binding obligations and the Company therefore advises you to consult an attorney before you sign it.

(b)   You understand that you may consider this Agreement for up to forty-five (45) days before deciding whether to sign it. If you sign this Agreement before the expiration of that forty-five (45) day period, you acknowledge that such decision was entirely voluntary. You understand that if you do not sign and return this Agreement to the Company's Chief People Officer by the end of that forty-five (45) day period, the offer of a Severance will expire. You also understand that for a period of seven (7) days after you execute this Agreement, you have the right to revoke it by a written notice to be received by the Company's Chief People Officer by the end of that period. You also understand that this Agreement shall not be effective or enforceable until the expiration of that period. You further represent and agree that you carefully read and fully understand all of the provisions of this Agreement and that you are voluntarily agreeing to those provisions.

(c)   In consideration for the payments set forth in this Agreement and other terms of this Agreement, except for the rights and the obligations created by this Agreement, Employee on Employee's own behalf and on behalf of Employee's heirs, beneficiaries, executors, administrators, representatives and assigns, and all others connected with or claiming through Employee, Employee hereby fully, finally and completely release and forever discharge, acquit, relinquish and hold harmless the Company and the other Affiliates and all of their respective past, present and future officers, directors, shareholders, general and limited partners, joint venturers, members, managers, employees, agents, predecessors, successors and assigns, and all other Persons connected with any of them (all, collectively, the "Released Parties"), both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, arising from facts or events occurring on or before the effective date of this Agreement. The foregoing release covers, without limitation, any and all claims arising from or related to your employment with the Released Parties such as claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq; the California Labor Code; any offer of employment letter, employee manual or handbook, or written employment agreement; other federal, state or local statute, ordinance, order and regulation and common law; negligence, gross negligence personal injury and/or tortious conduct; all tort, intentional tort, and contract (express or implied) claims; any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make the Agreement not binding; and all other claims or causes of action whatsoever which you may have now or in the future arising out of your employment relationship with the Released Parties, or otherwise, whether presently known or unknown, against the Released Parties on or before the time of your execution of this Agreement. Additionally, this release excludes any claim that cannot be released by private agreement. Notwithstanding the above, the Parties agree that this Agreement does not release any workers' compensation claims including, but not limited to Employee's current claims venued before the California Workers' Compensation Appeals Board with case numbers ADJ9967738 and ADJ9967566.

6

DEF000060

(d)   Full Release: Further, in signing this Agreement, which includes the release of claims set forth in the paragraph above ("Claims"), you represent that you are doing so with full knowledge of any and all rights which you have and that you have not relied on any representations made by the Company with regard to this Agreement. You expressly waive and relinquish all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and does so understanding and acknowledging the significance of such a specific waiver of Section 1542, which section states as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Released Parties, you expressly acknowledge that this Agreement and the release of claims included in it is intended to include in its effect, without limitation, all Claims which you do not know or suspect to exist in your favor at the time of execution hereof, and that this Agreement and such release of claims contemplate the extinguishment of all such Claims.

This release does not extend to any workers' compensation claims.

10.   Severance Program Disclosure. You acknowledge that, if you are age 40 or over, the Company provided you a document entitled "Disclosure of Information Related to Severance Program" on the same date that you received this General Release.

11.   Miscellaneous. The validity of this Agreement shall be construed under California law. The parties agree that this Agreement supersedes any and all prior agreements or understandings, written or oral, pertaining to Employee's employment and its termination and all related matters excluding only agreements between Employee and the Company or any of the other Affiliates with respect to confidentiality, non-solicitation of clients or employees or other restrictions and loans, if any, to Employee from the Company or any of the other Affiliates, or from any of their respective employee benefits plans, that are outstanding on the date you sign this Agreement, all of which shall continue in full force and effect in accordance with their terms. No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist. This Agreement cannot be changed orally, but may be changed only through written addendum executed by all parties. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Company. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

DEF000061

12.    Assurances: In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms and that you have had a full and sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney or any of the other Persons listed in the second sentence of Section 7(a) of this Agreement, should you wish to do so; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

13.    Complete Terms: This Agreement sets forth the final and complete terms of the agreement between Employer and Employee regarding Employee's termination of employment, and any compensation or other alleged or potential claims of Employee against Employer, asserted or unasserted.

Hakan Kip Kennedy has read and understands the Agreement set forth above. Employee accepts the consideration stated above and agrees to be bound by the terms of this Agreement.

Formalities aside, I want to thank you on behalf of the Company for your service and to wish you well in your future career.

Sincerely,

Andrea Wilson
Chief People Officer

Accepted and agreed:

Signature:

Name (please print): HAKAN KIP KENNEDY

Date: 10/12/2015

6

DEF000062

**Disclosure of Information Related to Severance Program**

Columbus Manufacturing, Inc. ("Columbus" or the "Company") is terminating your employment as part of a reduction in force. The Company is offering each employee who will be laid off as part of this reduction in force the opportunity to receive certain "Severance Benefits," as defined in the Severance Agreement ("Agreement"), in exchange for, among other terms, the affected employee's agreement to release any and all legal claims he or she may have against the Company. The release of legal claims is set forth in the Agreement accompanying this disclosure document.

Under the federal Age Discrimination in Employment Act ("ADEA"), employees age 40 or over who are offered severance pay in exchange for releases of legal claims as part of a standard program are entitled to receive certain information related to the program. This document provides that required information.

1.     **Eligibility for Severance:** All persons being laid off as part of the current reduction in force are eligible for Severance Benefits.

2.     **Time Limits for Decisions:** All persons who are being offered Severance Benefits must sign the Company's proposed general release and return it to the Human Resources Department. Employees may take up to 45 days after receiving the general release to sign and return it. Once the general release has been signed, Employee may revoke the agreement within seven days of signing.

3.     **Factors Considered in Selection Decisions:** Employees were selected for the current reduction in force based on the Company's assessment of its business needs. In some circumstances, positions were eliminated without retaining employees who performed similar functions. In other circumstances, the Company selected positions for elimination from among individuals performing similar functions. The considerations that the Company used when selecting from among individuals who performed similar functions were its assessments of skills, knowledge, experience, responsibilities and job performance in light of the Company's business needs.

4.     **Listing of Persons Selected and Not Selected:** Under ADEA, employees who are age 40 or over are entitled to certain information about other employees who are being laid off and are being offered Severance Benefits. The information to be provided covers all persons in the "decisional unit" for the current reduction in force. The "decisional unit" is the portion of the Company's organization from which the Company decided who would be selected for the reduction in force and therefore offered Severance Pay and who would not. The decisional unit is the Operations group of the Company. The following lists the ages and job titles of all persons in the decisional unit who were and were not selected for the reduction in force and Severance Benefits eligibility:

7

DEF000063

| Job Title | Age | No. Selected | No. Not Selected |
|---|---|---|---|
| Associate Director, Co-Manufacturing | 50 | 0 | 1 |
| Associate Director, Engineering | 39 | 0 | 1 |
| Director of Engineering | 44 | 0 | 1 |
| Director of Quality Assurance | 55 | 0 | 1 |
| Facilities Engineer | 62 | 1 | 0 |
| Sr. Maintenance Manager | 40 | 0 | 1 |
| Maintenance Manager | 51 | 0 | 1 |
| Plant Manager | 65 | 1 | 0 |
| Plant Manager | 47 | 0 | 1 |
| Sr. Plant Manager | 57 | 0 | 1 |
| QA Plant Manager I | 35 | 0 | 1 |
| QA Plant Manager I | 36 | 0 | 1 |
| QA Plant Manager II | 45 | 1 | 0 |
| Salame Fermentation Manager | 65 | 0 | 1 |
| Sanitation Supervisor | 51 | 1 | 0 |
| Sr. Mgr, Environ Comp, Infrastructure, Safety | 46 | 0 | 1 |

Updated as of Date: July 10, 2015

Firmwide:133912555.1 065840.1000

8

August 27, 2015

Hakan Kip Kennedy
~~832 Derry Circle~~ *PO BOX 1962*
~~Vacaville, CA 95688~~ *DAVIS, CA 95617*

Dear Kip:

As has been discussed, your employment with Columbus Manufacturing, Inc. ("Columbus" or the "Company") will end on August 29, 2015 (the "Separation Date"). Provided you accept it, this Severance Agreement letter ("Agreement") constitutes the agreement between you and the Company concerning your separation from the Company.

The Separation Date is defined as your termination date. The Company has the right to alter the Separation Date, if necessary, driven by business needs.

    1.     Severance: If, in addition to fulfilling all of your obligations under this Agreement, you sign and return this Agreement by ~~October 12, 2015~~, then the Company will provide you with the following: *OCTOBER 14, 2015*

    (a)     a severance sum of $█████ representing ~~10~~ *26* pay periods (~~20~~ *52* weeks of pay) of your regular compensation, and an additional sum of █████ less any lawful *→ PAYMENT TO ANNUITY ACCOUNT* deductions ("Severance Benefits"), upon the terms and conditions set forth herein. The Severance will be paid to you in one lump sum. You acknowledge and agree that you would not otherwise be entitled to Severance but for your execution of this Agreement. You acknowledge and agree that this Severance is not required by the Company's policies and procedures or by any prior agreement between the Company and its Employees.

    2.     Affirmations: You represent and affirm that you have been paid and/or received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which you may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due to you. You also represent and affirm that you reported to the Company any and all work-related injuries incurred by you during your employment by the Company and have been properly provided any leave of absence because of your or your family member's health condition and affirm that you have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave.

    3.     Timing of Payment: The Company will begin remitting the Severance payments to you via direct deposit within fifteen business (15) days of the Separation Date, provided it is in

*@ptus*
COURT REPORTING

Exhibit: _10_
Witness: *Kennedy*
Date: _12·28·19_

1

receipt of a signed copy of this Agreement and that it has not been revoked. The signed Agreement must be post-marked no later than ~~October 12, 2015.~~ OCTOBER 14, 2015

4.    Withholding. All payments by the Company under this Agreement will be reduced by all taxes and other amounts that the Company is required to withhold under applicable law and all other deductions authorized by you.

5.    Acknowledgement of Full Payment. You acknowledge and agree that payment by the Company in accordance with this Agreement shall be in complete satisfaction of any and all sums that are now or might hereafter have become owing to you for services rendered by you.

6.    Status of Paid Time Off and Employee Benefits. You will not continue to earn vacation or other paid time off after the date your employment terminates and, except for any right that you have to continue participation in the Company's group health and dental plans through COBRA, your participation in all employee benefit plans of the Company will end as of the Separation Date, in accordance with the terms of those plans.

7.    Continuing Obligations. The following obligations shall not only apply after the effective date of this Agreement, but also, during the period from the date you receive this Agreement until its effective date, and are a condition of your eligibility to accept this Agreement:

(a)    Confidentiality. You agree that you will continue to protect Confidential Information, as defined below, and also agree that you will never, directly or indirectly, use or disclose it, other than as required for the proper performance of your regular duties for the Company during the remainder of your employment or as required by applicable law or legal process after prompt notice to the Chief People Officer and a reasonable opportunity for the Company to seek protection of the Confidential Information prior to your disclosure. In addition, you agree that you will not disclose this Agreement or any of its terms or provisions, directly or by implication, except (i) to members of your immediate family and to your legal, tax and other professional advisors, and then only on condition that they agree not to further disclose this Agreement or any of its terms or provisions to others; (ii) as required by applicable law or by court order or other legal process or at the request of federal or state tax authorities; and (iii) to any actual and prospective employer or any other entity for whom you intend or propose to provide services, to inform them of your continuing obligations to the Company under this Section. Nothing in this paragraph is intended to preclude the parties from disclosing the existence and terms of this Agreement as necessary to enforce its terms or in connection with a claim for breach of this Agreement or from participating in any investigation by any government entity into employment, ethics, or compliance issues. Your obligations under this Section 7(a) will continue to apply so long as there is Confidential Information.

(b)    Obligation Not to Disparage. You agree that during the remainder of your employment and thereafter, you will not directly or indirectly engage in any conduct that will disparage, denigrate, or discredit the Released Parties, as defined below.

2

(c)   Return of Documents and Disclosure of Passwords. You agree to return to the Company, no later than the Separation Date and at such earlier time or times as the Company may specify, any and all documents, materials and information related to the business, whether present or otherwise, of the Company or any of the other Affiliates, and all copies thereof, and all keys and other property of the Company and the other Affiliates then in your possession or control. You agree that, following termination of your employment, you will not, for any purpose, attempt to access or use any computer or computer network or system of the Company or any of the other Affiliates. Further, you agree to disclose to the Company no later than the last day of your employment and at such earlier time or times as the Company may specify, all passwords necessary or desirable to enable the Company to access any and all information that you have password-protected on its computer network or system or that of any of the other Affiliates.

(d)   Cooperation. You agree to cooperate with the Company during your employment and thereafter with respect to all matters arising during or related to your employment, including without limitation to all matters in connection with any governmental investigation, litigation or regulatory or other proceeding that may have arisen or that may arise following the signing of this Agreement. The Company will pay any out-of-pocket expenses you incur in the course of any requested cooperation, if approved in advance. Should this require your time after your Separation Date, you will be compensated at a reasonable mutually agreed upon rate, exclusive of time, if any, spent testifying as a fact witness at any legal proceeding, and, exclusive of your obligations to testify at any legal proceeding, your meetings and other communications will take place at mutually agreed times and places.

8.   Definitions. As used in this Agreement:

"Affiliates" means any and all Persons with whom the Company has or had a management or advisory contract or relationship during the term of your employment, any entities in which any such Person had an equity investment (other than a public company in which such Persons do not, in the aggregate, own a controlling interest) and any Persons directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

"Confidential Information" means any and all information of the Company and the other Affiliates that is not generally known to those Persons with whom any of them competes or does business or with whom any of them plans to compete or do business. Confidential Information also includes any and all other information received by the Company or any of the other Affiliates from any other Person with any understanding, express or implied, that the information would not be disclosed. Confidential Information does not include information that is in the public domain or enters the public domain other than through your breach of this Agreement or a breach by you or any other Person of a duty of confidentiality owed to the Company or any of the other Affiliates.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership (including a limited partnership), an estate, a trust or any other entity or organization.

3

9.    Release of Claims.

(a)    The Company wants to be certain that this Agreement will resolve any and all concerns that you might have and therefore requests that you carefully consider its terms, including the release of claims contained in Section 9(c) below. This Agreement creates legally-binding obligations and the Company therefore advises you to consult an attorney before you sign it.

(b)    You understand that you may consider this Agreement for up to forty-five (45) days before deciding whether to sign it. If you sign this Agreement before the expiration of that forty-five (45) day period, you acknowledge that such decision was entirely voluntary. You understand that if you do not sign and return this Agreement to the Company's Chief People Officer by the end of that forty-five (45) day period, the offer of a Severance will expire. You also understand that for a period of seven (7) days after you execute this Agreement, you have the right to revoke it by a written notice to be received by the Company's Chief People Officer by the end of that period. You also understand that this Agreement shall not be effective or enforceable until the expiration of that period. You further represent and agree that you carefully read and fully understand all of the provisions of this Agreement and that you are voluntarily agreeing to those provisions.

(c)    In consideration for the payments set forth in this Agreement and other terms of this Agreement, except for the rights and the obligations created by this Agreement, Employee on Employee's own behalf and on behalf of Employee's heirs, beneficiaries, executors, administrators, representatives and assigns, and all others connected with or claiming through Employee, Employee hereby fully, finally and completely release and forever discharge, acquit, relinquish and hold harmless the Company and the other Affiliates and all of their respective past, present and future officers, directors, shareholders, general and limited partners, joint venturers, members, managers, employees, agents, predecessors, successors and assigns, and all other Persons connected with any of them (all, collectively, the "Released Parties"), both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, arising from facts or events occurring on or before the effective date of this Agreement. The foregoing release covers, without limitation, any and all claims arising from or related to your employment with the Released Parties such as claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq; the California Labor Code; any offer of employment letter, employee manual or handbook, or written employment agreement; other federal, state or local statute, ordinance, order and regulation and common law; negligence, gross negligence personal injury and/or tortious conduct; all tort, intentional tort, and contract (express or implied) claims; any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make the Agreement not binding; and all other claims or causes of action whatsoever which you may have now or in the future arising out of your employment relationship with the Released Parties, or otherwise, whether presently known or unknown, against the Released Parties on or before the time of your execution of this Agreement. Additionally, this release excludes any claim that cannot be released by private agreement. Notwithstanding the above, the Parties agree that this Agreement does not release any workers' compensation claims including, but not limited to Employee's current claims venued before the California Workers' Compensation Appeals Board with case numbers ADJ9967738 and ADJ9967566. (ERISA)
THIS AGREEMENT DOES NOT RELEASE ANY LONG TERM DISABILITY (ERISA) CLAIMS INCLUDING CURRENT CLAIMS WITH CASE NUMBERS (UNUM)(CLAIMS) 10242275, 10912603, 10436535.

(d)    Full Release: Further, in signing this Agreement, which includes the release of claims set forth in the paragraph above ("Claims"), you represent that you are doing so with full knowledge of any and all rights which you have and that you have not relied on any representations made by the Company with regard to this Agreement. You expressly waive and relinquish all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and does so understanding and acknowledging the significance of such a specific waiver of Section 1542, which section states as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Released Parties, you expressly acknowledge that this Agreement and the release of claims included in it is intended to include in its effect, without limitation, all Claims which you do not know or suspect to exist in your favor at the time of execution hereof, and that this Agreement and such release of claims contemplate the extinguishment of all such Claims.

This release does not extend to any workers' compensation claims, and any Long Term Disability (QLSA) claims or related claims.

10.    Severance Program Disclosure. You acknowledge that, if you are age 40 or over, the Company provided you a document entitled "Disclosure of Information Related to Severance Program" on the same date that you received this General Release.

11.    Miscellaneous. The validity of this Agreement shall be construed under California law. The parties agree that this Agreement supersedes any and all prior agreements or understandings, written or oral, pertaining to Employee's employment and its termination and all related matters excluding only agreements between Employee and the Company or any of the other Affiliates with respect to confidentiality, non-solicitation of clients or employees or other restrictions and loans, if any, to Employee from the Company or any of the other Affiliates, or from any of their respective employee benefits plans, that are outstanding on the date you sign this Agreement, all of which shall continue in full force and effect in accordance with their terms. No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist. This Agreement cannot be changed orally, but may be changed only through written addendum executed by all parties. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Company. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

    12.     Assurances: In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms and that you have had a full and sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney or any of the other Persons listed in the second sentence of Section 7(a) of this Agreement, should you wish to do so; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

    13.     Complete Terms: This Agreement sets forth the final and complete terms of the agreement between Employer and Employee regarding Employee's termination of employment, and any compensation or other alleged or potential claims of Employee against Employer, asserted or unasserted.

Hakan Kip Kennedy has read and understands the Agreement set forth above. Employee accepts the consideration stated above and agrees to be bound by the terms of this Agreement.

Formalities aside, I want to thank you on behalf of the Company for your service and to wish you well in your future career.

Sincerely,

Andrea Wilson
Chief People Officer

Accepted and agreed:

Signature: _____

Name (please print):

Date:

6

### Disclosure of Information Related to Severance Program

Columbus Manufacturing, Inc. ("Columbus" or the "Company") is terminating your employment as part of a reduction in force. The Company is offering each employee who will be laid off as part of this reduction in force the opportunity to receive certain "Severance Benefits," as defined in the Severance Agreement ("Agreement"), in exchange for, among other terms, the affected employee's agreement to release any and all legal claims he or she may have against the Company. The release of legal claims is set forth in the Agreement accompanying this disclosure document.

Under the federal Age Discrimination in Employment Act ("ADEA"), employees age 40 or over who are offered severance pay in exchange for releases of legal claims as part of a standard program are entitled to receive certain information related to the program. This document provides that required information.

1.   **Eligibility for Severance:** All persons being laid off as part of the current reduction in force are eligible for Severance Benefits.

2.   **Time Limits for Decisions:** All persons who are being offered Severance Benefits must sign the Company's proposed general release and return it to the Human Resources Department. Employees may take up to 45 days after receiving the general release to sign and return it. Once the general release has been signed, Employee may revoke the agreement within seven days of signing.

3.   **Factors Considered in Selection Decisions:** Employees were selected for the current reduction in force based on the Company's assessment of its business needs. In some circumstances, positions were eliminated without retaining employees who performed similar functions. In other circumstances, the Company selected positions for elimination from among individuals performing similar functions. The considerations that the Company used when selecting from among individuals who performed similar functions were its assessments of skills, knowledge, experience, responsibilities and job performance in light of the Company's business needs.

4.   **Listing of Persons Selected and Not Selected:** Under ADEA, employees who are age 40 or over are entitled to certain information about other employees who are being laid off and are being offered Severance Benefits. The information to be provided covers all persons in the "decisional unit" for the current reduction in force. The "decisional unit" is the portion of the Company's organization from which the Company decided who would be selected for the reduction in force and therefore offered Severance Pay and who would not. The decisional unit is the Operations group of the Company. The following lists the ages and job titles of all persons in the decisional unit who were and were not selected for the reduction in force and Severance Benefits eligibility:

7

| Job Title | Age | No. Selected | No. Not Selected |
|---|---|---|---|
| Associate Director, Co-Manufacturing | 50 | 0 | 1 |
| Associate Director, Engineering | 39 | 0 | 1 |
| Director of Engineering | 44 | 0 | 1 |
| Director of Quality Assurance | 55 | 0 | 1 |
| Facilities Engineer | 62 | 1 | 0 |
| Sr. Maintenance Manager | 40 | 0 | 1 |
| Maintenance Manager | 51 | 0 | 1 |
| Plant Manager | 65 | 1 | 0 |
| Plant Manager | 47 | 0 | 1 |
| Sr. Plant Manager | 57 | 0 | 1 |
| QA Plant Manager I | 35 | 0 | 1 |
| QA Plant Manager I | 36 | 0 | 1 |
| QA Plant Manager II | 45 | 1 | 0 |
| Salame Fermentation Manager | 65 | 0 | 1 |
| Sanitation Supervisor | 51 | 1 | 0 |
| Sr. Mgr, Environ Comp, Infrastructure, Safety | 46 | 0 | 1 |

Updated as of Date: July 10, 2015

Firmwide:133912555.1 065840.1000

8

| | |
|---|---|
| **From:** | Andrea Wilson |
| **To:** | Pierce, Natalie A.; Ileana Pacheco; Marisa Vladislavich |
| **Cc:** | Chapman, Keith |
| **Subject:** | RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy |
| **Date:** | Thursday, August 27, 2015 12:56:23 PM |



**From:** Pierce, Natalie A. [mailto:NPierce@littler.com]
**Sent:** Thursday, August 27, 2015 12:50 PM
**To:** Andrea Wilson; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy



**Natalie Pierce**, Shareholder
415.288.6321 direct  415.743.6539 fax  npierce@littler.com
650 California Street, 20th Floor | San Francisco, CA 94108-2693

 | littler.com
Employment & Labor Law Solutions Worldwide

**From:** Andrea Wilson [mailto:awilson@COLUMCO.COM]
**Sent:** Thursday, August 27, 2015 12:45 PM
**To:** Pierce, Natalie A.; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy

*(aptus court reporting)*
Exhibit: _11_
Witness: _Kennedy_
Date: _12·28·17_

**From:** Pierce, Natalie A. [mailto:NPierce@littler.com]
**Sent:** Thursday, August 27, 2015 12:30 PM
**To:** Andrea Wilson; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy



**Natalie Pierce**, Shareholder
415.288.6321 direct  415.743.6539 fax  npierce@littler.com
650 California Street, 20th Floor | San Francisco, CA 94108-2693

 | littler.com
Employment & Labor Law Solutions Worldwide

**From:** Andrea Wilson [mailto:awilson@COLUMCO.COM]
**Sent:** Wednesday, August 26, 2015 5:23 PM
**To:** Pierce, Natalie A.; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy



**From:** Pierce, Natalie A. [mailto:NPierce@littler.com]
**Sent:** Wednesday, August 26, 2015 4:43 PM
**To:** Andrea Wilson; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** RE: Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy

**Natalie Pierce**, Shareholder
415.288.6321 direct  415.743.6539 fax  npierce@littler.com
650 California Street, 20th Floor | San Francisco, CA 94108-2693

**Littler** | littler.com

Employment & Labor Law Solutions Worldwide

**From:** Andrea Wilson [mailto:awilson@COLUMCO.COM]
**Sent:** Wednesday, August 26, 2015 2:35 PM
**To:** Pierce, Natalie A.; Ileana Pacheco; Marisa Vladislavich
**Cc:** Chapman, Keith
**Subject:** Help? PLEASE REVIEW ASAP. Need by COD - Kip Kennedy
**Importance:** High



**From:** Kip kennedy [mailto:kiphkennedy@gmail.com]
**Sent:** Friday, July 31, 2015 8:06 AM
**To:** Andrea Wilson
**Subject:** Re: Separation Agreement / Next Steps

Hi Andrea,

Yes, I will continue my communication through e-mail.
I just want to remind you of my terms below in order to accept a new severance agreement offer.

1.   As the new agreement is referring to the last year's agreement (May 2014) which the company had promised to pay ████ bonus and also the salary income with benefits until August 31, 2015. I kindly demand the total amount of payment as stated in that previous agreement. As I was involuntarily absent due to disabling medical conditions, the company hasn't paid me any income during this period of employment as stated in the severance agreement. To finalize this agreement, the total amount that the company should pay; ████████ (a year salary with benefits and bonus) per this agreement. I request this amount to be paid in bi-weekly payments; of ████ payment starting on 9/1/2015 until 12/31/2015 and of ████ payment starting on 1/1/2016 until 12/31/2016.

2.   I don't need to know the real reason why the company had decided to terminate my employment by August 29, 2015 if the company pays ████ to my annuity account by 10/1/2015 which will also eliminate a massive future employment lawsuit.

3.   I request a reference letter to state my employment period, job title info and my good

DEF000067

performance during this period.

4.  I will only release my rights to the company and to its executives if a modified agreement is written under the terms above and then if signed by both parties. The modified agreement will not release my rights on Workers Comp, Disability, ERISA, Unemployment Insurance (if applicable in the future) and will not also be releasing my rights to the affiliates of the company.

Kindest Regards
Kip

On Thu, Jul 30, 2015 at 10:30 PM, Andrea Wilson <awilson@columco.com> wrote:
Yes.

To reiterate, you would like to continue communications through email and not by phone or in person?  Please confirm.

Your term date is August 29th.  At some point we need to hold your standard exit meeting / conversation (to collect any company property, to review benefits options, etc).

I am away for just a few days so I will resend our final severance package this coming Wednesday, August 5, when I return.

Please let me know if I have your request correct?

On Jul 29, 2015, at 9:48 PM, Kip kennedy <kiphkennedy@gmail.com> wrote:

> Hi Andrea
>
> After consulting with my attorney, I like to continue the severance agreement negotiation communication through e-mail. Please let me know if you are interested to discuss the severance amount and agreement terms further.
>
> Kindest Regards
> Kip
>
> On Wed, Jul 22, 2015 at 11:03 PM, Kip kennedy <kiphkennedy@gmail.com> wrote:
> Andrea,
>
> I will let you know next week about the phone conversation time windows as I will consult with my attorney sometime this week. Also per your e-mail regarding separation, I want to remind you of medical leave notification sent by my doctor on May 2015 stating that I may be able to come back to work by November 11, 2015 which means basically I want my job back at the new plant if I be able to come back based on my medical condition improvement which I may be able to do my job with accommodations. Therefore I want to ask you; is my

termination decision final and will my separation from the company be executed on August 29, 2015 per your previous e-mail?

Kindest Regards
Kip Kennedy

On Wed, Jul 22, 2015 at 10:09 AM, Andrea Wilson <awilson@columco.com> wrote:
Kip

Please do.  Come back to me with a few windows of time. As per your request, we would be happy to speak with you and explain the package.

Please reach out to me when you're ready. Your official separation date is a few weeks away.

Thank you Kip.


On Jul 22, 2015, at 7:59 AM, Kip kennedy <kiphkennedy@gmail.com> wrote:

Hi Andrea

That would be a pleasure for me to talk with Paul but for a phone conference like this, I need to consult with my attorney and I will let you know.

Kindest Regards
Kip

On Tue, Jul 21, 2015 at 5:04 PM, Andrea Wilson <awilson@columco.com> wrote:
Good afternoon Kip.

Paul and I would very much like to talk with you about the terms. Can the three of us set up a call tomorrow or Thursday? Let us know your availability for a phone call.

Much thanks,

Andrea Wilson

**From:** Kip kennedy [mailto:kiphkennedy@gmail.com]
**Sent:** Saturday, July 11, 2015 6:46 AM
**To:** Andrea Wilson
**Subject:** Re: Separation Agreement / Next Steps

Andrea,

I haven't asked  for updates and clarity about the status of plant

DEF000069

closure as it doesn't really matter after receiving a severance agreement with a termination date of August 29, 2015. I have simply asked to negotiate on the terms of the new severance agreement and I have sent my terms in order to accept a severance agreement offer which the result will make me happy and will make you happy by getting rid of me. If you are interested to negotiate, please let me know soon, before I bring my attorney to the table which will also cost to the company much more during severance negotiations and if the case ends up in litigation.

Also since you have given a chronology of events, I have noticed some wrong information on your e-mail that I need to correct.
I was not shared the plant closure plan 2 years ago. The first time, I was told verbally by you, Ken and Paul; was November 21, 2013 which you have also stated that the South San Francisco plant management will continue to work until the plant closes in a few years. Then Ken Neishi officially announced closure of Deli Operations by summer 2014 while transferring the deli operations to Visalia, CA plant but also stated that the salame operation at South San Francisco plant will continue.
Then on May 5th, 2014, you have presented me a severance agreement offer with a termination date of August 29, 2015.
On 5/21/2014, Company President Tim Fallon publicly announced the new salame plant construction and planned operation to be by summer 2015 at the new plant.
I rejected the severance agreement offer on June 2014.
I started my medical leave on August 30, 2014 due to my medical condition caused by a work injury.
On May 2015, I have e-mailed the company through Ileana that my planned back to work date with accommodations to be on November 11,2015 stated on the company FMLA form by my doctor.
Then on June 2, 2015, you have presented me another severance agreement referring to the agreement presented last year which was rejected. This agreement has also stated that due to closure of the plant all South San Francisco managers except me; are kept in the company and are transferred to the new salame plant at Hayward by summer 2015.

Please let me know soon if you like to negotiate on the severance agreement terms and the amount or if I don't hear by beginning of next week, I will inform my employment attorney to contact with you before July 20, 2015.

Kindest Regards
Hakan Kip Kennedy

On Fri, Jul 10, 2015 at 4:58 PM, Andrea Wilson
<awilson@columco.com> wrote:

Kip,

I will do my best to help provide updates and clarity for you, given the amount of time that has passed.  As always, please feel free to call me at any time.

The Forbes plant is now all the way powered down, with the exception of just a few fermentation/spice staff.  We stopped making product in May. The plan to close Forbes has been in motion and was communicated to you, and all impacted employees now for nearly 2 years, with updates along the way.  Your role along with others, is being eliminated as the plant is no longer in operation.

When we first shared the elimination plan with you nearly 2 years ago, you were given an opportunity to help close the plant over a long and methodical period of more than a year, prior to any job elimination.  You were given an agreement which stated all of the above, including a transition bonus for your work during the transition time frame as well as a severance upon the ultimate job elimination.  You chose not to sign the agreement, which was your prerogative, thereby foregoing the offer of a transition bonus in exchange for your execution of the agreement.

You continued working as a QA Manager at Forbes for a period of time after the deadline to accept the agreement had expired, but then took a leave of absence for medical reasons.  Prior to and throughout your leave, we have provided you information to assist you with your leave. Despite the fact that you were unable to return to help with the transition while on leave, we held your role open, and continue to do so. You have provided us updates over this past year, and have continued to suggest that you will not be able to return to help with the transition prior to plant closure.

Your original termination date was set for August 29, 2015, as was reflected in your first separation agreement.  The date will remain the same, and we will continue to administer and process your termination as we will with others impacted by the plant closure.

Attached is your updated separation agreement. You remain eligible for severance benefits. You have expressed concerns that your execution of a release will impact your ongoing workers compensation claim. I will remind you that this attached agreement settlement does not extend to any ongoing workers' compensation claims. You will remain able to pursue those claims even if you choose to sign the separation agreement.

Please let me know your thoughts on these issues.  As always, I am happy to help in any way I can should you have any questions.

DEF000071

Best,

Andrea Wilson
415-717-8316

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**From:** Kip kennedy [mailto:kiphkennedy@gmail.com]
**Sent:** Monday, July 06, 2015 9:50 AM
**To:** Andrea Wilson
**Subject:** Fwd: Severance Agreement

Dear Andrea

I was hoping to connect with you regarding this severance agreement
offer but I haven't heard from you. I am still hoping that we can
connect this week otherwise, I have no other option than bringing
my employment attorney to the table by next week.
Please let me know if you are interested to connect this week.

Kindest Regards
Kip Kennedy

---------- Forwarded message ----------
From: **Kip kennedy** <kiphkennedy@gmail.com>
Date: Sun, Jun 21, 2015 at 8:20 PM
Subject: Severance Agreement
To: Andrea Wilson <awilson@columco.com>

Dear Andrea,
I have received a new severance agreement through my workers
comp attorney. Just to let you know; Alexander Ennis is my workers
comp attorney but not my employment attorney.
This new severance agreement is referring to the agreement presented
last year on May which was refused previously. This new agreement
is also presented during my medical leave ($2^{nd}$ FMLA period) and it
states my termination date to be on August 29, 2015 which is in this
period as well. I have to remind you that this action only by itself,
will be a good reason for an employment lawsuit.
But since you have determined to terminate my employment, I will
be very direct and fair to state my terms below in order to accept a
modified agreement which will release my rights to the company.
I have hope that we can settle this between us before I bring an
employment attorney to the table.
1.   As the new agreement is referring to the last year's agreement
(May 2014) which the company had promised to pay ██████████
bonus and also the salary income with benefits until August 31,

DEF000072

2015. I kindly demand the total amount of payment as stated in that previous agreement. As I was involuntarily absent due to disabling medical conditions, the company hasn't paid me any income during this period of employment as stated in the severance agreement. To finalize this agreement, the total amount that the company should pay; ███████████ (a year salary with benefits and bonus) per this agreement. I request this amount to be paid in bi-weekly payments; of ████ payment starting on 9/1/2015 until 12/31/2015 and of ████ payment starting on 1/1/2016 until 12/31/2016.

2.   I don't need to know the real reason why the company had decided to terminate my employment by August 29, 2015 if the company pays ██████ to my annuity account by 10/1/2015 which will also eliminate a massive future employment lawsuit.

3.   I request a reference letter to state my employment period, job title info and my good performance during this period.

4.   I will only release my rights to the company and to its executives if a modified agreement is written under the terms above and then if signed by both parties. The modified agreement will not release my rights on Workers Comp, Disability, ERISA, Unemployment Insurance (if applicable in the future) and will not also be releasing my rights to the affiliates of the company.

   I hope to hear from you soon.


Kindest Regards
Kip Kennedy


--------------------------

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.


--------------------------

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the

sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

--------------------------

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

DEF000074

August 27, 2015

Hakan Kip Kennedy
~~832 Derry Circle~~      *PO BOX 1962*
~~Vacaville, CA 95688~~  *DAVIS, CA 95617*
               *MK*

Dear Kip:

As has been discussed, your employment with Columbus Manufacturing, Inc. ("Columbus" or the "Company") will end on August 29, 2015 (the "Separation Date"). Provided you accept it, this Severance Agreement letter ("Agreement") constitutes the agreement between you and the Company concerning your separation from the Company.

The Separation Date is defined as your termination date. The Company has the right to alter the Separation Date, if necessary, driven by business needs.

    1.    <u>Severance:</u> If, in addition to fulfilling all of your obligations under this Agreement, you sign and return this Agreement by October 12, 2015, then the Company will provide you with the following:

        (a)    a severance sum of $███████ representing 10 pay periods (20 weeks of pay) of your regular compensation, and an additional sum of $███████ less any lawful *HK* deductions ("Severance Benefits"), upon the terms and conditions set forth herein. The Severance will be paid to you in one lump sum. You acknowledge and agree that you would not otherwise be entitled to Severance but for your execution of this Agreement. You acknowledge and agree that this Severance is not required by the Company's policies and procedures or by any prior agreement between the Company and its Employees.

    2.    <u>Affirmations:</u> You represent and affirm that you have ~~been paid~~ and/or received all leave (paid or unpaid), ~~compensation, wages, bonuses, commissions,~~ and/or benefits to which you may be entitled and that no ~~other leave~~ (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due to you. ~~You~~ also represent and affirm that you reported to the Company any and all work-related injuries incurred by you during your employment by the Company and have been properly provided any leave of absence because of your or your family member's health condition and affirm that you have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave. *HK*
*I HAVE NOT RECEIVED OR PAID YET!*

    3.    <u>Timing of Payment:</u> The Company will begin remitting the Severance payments to you via direct deposit within fifteen business (15) days of the Separation Date, provided it is in

*@ptus*
COURT REPORTING

Exhibit: *12*
Witness: *Kennedy*
Date: *12-28-17*

receipt of a signed copy of this Agreement and that it has not been revoked. The signed Agreement must be post-marked no later than October 12, 2015.

    4.    <u>Withholding.</u> All payments by the Company under this Agreement will be reduced by all taxes and other amounts that the Company is required to withhold under applicable law and all other deductions authorized by you.

    5.    <u>Acknowledgement of Full Payment.</u> You acknowledge and agree that payment by the Company in accordance with this Agreement shall be in complete satisfaction of any and all sums that are now or might hereafter have become owing to you for services rendered by you.

    6.    <u>Status of Paid Time Off and Employee Benefits.</u> You will not continue to earn vacation or other paid time off after the date your employment terminates and, except for any right that you have to continue participation in the Company's group health and dental plans through COBRA, your participation in all employee benefit plans of the Company will end as of the Separation Date, in accordance with the terms of those plans.

    7.    <u>Continuing Obligations.</u> The following obligations shall not only apply after the effective date of this Agreement, but also, during the period from the date you receive this Agreement until its effective date, and are a condition of your eligibility to accept this Agreement:

    (a)    <u>Confidentiality.</u> You agree that you will continue to protect Confidential Information, as defined below, and also agree that you will never, directly or indirectly, use or disclose it, other than as required for the proper performance of your regular duties for the Company during the remainder of your employment or as required by applicable law or legal process after prompt notice to the Chief People Officer and a reasonable opportunity for the Company to seek protection of the Confidential Information prior to your disclosure. In addition, you agree that you will not disclose this Agreement or any of its terms or provisions, directly or by implication, except (i) to members of your immediate family and to your legal, tax and other professional advisors, and then only on condition that they agree not to further disclose this Agreement or any of its terms or provisions to others; (ii) as required by applicable law or by court order or other legal process or at the request of federal or state tax authorities; and (iii) to any actual and prospective employer or any other entity for whom you intend or propose to provide services, to inform them of your continuing obligations to the Company under this Section. Nothing in this paragraph is intended to preclude the parties from disclosing the existence and terms of this Agreement as necessary to enforce its terms or in connection with a claim for breach of this Agreement or from participating in any investigation by any government entity into employment, ethics, or compliance issues. Your obligations under this Section 7(a) will continue to apply so long as there is Confidential Information.

    (b)    <u>Obligation Not to Disparage.</u> You agree that during the remainder of your employment and thereafter, you will not directly or indirectly engage in any conduct that will disparage, denigrate, or discredit the Released Parties, as defined below.

(c)    Return of Documents and Disclosure of Passwords. You agree to return to the Company, no later than the Separation Date and at such earlier time or times as the Company may specify, any and all documents, materials and information related to the business, whether present or otherwise, of the Company or any of the other Affiliates, and all copies thereof, and all keys and other property of the Company and the other Affiliates then in your possession or control. You agree that, following termination of your employment, you will not, for any purpose, attempt to access or use any computer or computer network or system of the Company or any of the other Affiliates. Further, you agree to disclose to the Company no later than the last day of your employment and at such earlier time or times as the Company may specify, all passwords necessary or desirable to enable the Company to access any and all information that you have password-protected on its computer network or system or that of any of the other Affiliates.

(d)    Cooperation. You agree to cooperate with the Company during your employment and thereafter with respect to all matters arising during or related to your employment, including without limitation to all matters in connection with any governmental investigation, litigation or regulatory or other proceeding that may have arisen or that may arise following the signing of this Agreement. The Company will pay any out-of-pocket expenses you incur in the course of any requested cooperation, if approved in advance. Should this require your time after your Separation Date, you will be compensated at a reasonable mutually agreed upon rate, exclusive of time, if any, spent testifying as a fact witness at any legal proceeding, and, exclusive of your obligations to testify at any legal proceeding, your meetings and other communications will take place at mutually agreed times and places.

8.    Definitions. As used in this Agreement:

"Affiliates" means any and all Persons with whom the Company has or had a management or advisory contract or relationship during the term of your employment, any entities in which any such Person had an equity investment (other than a public company in which such Persons do not, in the aggregate, own a controlling interest) and any Persons directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

"Confidential Information" means any and all information of the Company and the other Affiliates that is not generally known to those Persons with whom any of them competes or does business or with whom any of them plans to compete or do business. Confidential Information also includes any and all other information received by the Company or any of the other Affiliates from any other Person with any understanding, express or implied, that the information would not be disclosed. Confidential Information does not include information that is in the public domain or enters the public domain other than through your breach of this Agreement or a breach by you or any other Person of a duty of confidentiality owed to the Company or any of the other Affiliates.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership (including a limited partnership), an estate, a trust or any other entity or organization.

9.      Release of Claims.

(a)      The Company wants to be certain that this Agreement will resolve any and all concerns that you might have and therefore requests that you carefully consider its terms, including the release of claims contained in Section 9(c) below. This Agreement creates legally-binding obligations and the Company therefore advises you to consult an attorney before you sign it.

(b)      You understand that you may consider this Agreement for up to forty-five (45) days before deciding whether to sign it. If you sign this Agreement before the expiration of that forty-five (45) day period, you acknowledge that such decision was entirely voluntary. You understand that if you do not sign and return this Agreement to the Company's Chief People Officer by the end of that forty-five (45) day period, the offer of a Severance will expire. You also understand that for a period of seven (7) days after you execute this Agreement, you have the right to revoke it by a written notice to be received by the Company's Chief People Officer by the end of that period. You also understand that this Agreement shall not be effective or enforceable until the expiration of that period. You further represent and agree that you carefully read and fully understand all of the provisions of this Agreement and that you are voluntarily agreeing to those provisions.

(c)      In consideration for the payments set forth in this Agreement and other terms of this Agreement, except for the rights and the obligations created by this Agreement, Employee on Employee's own behalf and on behalf of Employee's heirs, beneficiaries, executors, administrators, representatives and assigns, and all others connected with or claiming through Employee, Employee hereby fully, finally and completely release and forever discharge, acquit, relinquish and hold harmless the Company and the other Affiliates and all of their respective past, present and future officers, directors, shareholders, general and limited partners, joint venturers, members, managers, employees, agents, predecessors, successors and assigns, and all other Persons connected with any of them (all, collectively, the "Released Parties"), both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, arising from facts or events occurring on or before the effective date of this Agreement. The foregoing release covers, without limitation, any and all claims arising from or related to your employment with the Released Parties such as claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq; the California Labor Code; any offer of employment letter, employee manual or handbook, or written employment agreement; other federal, state or local statute, ordinance, order and regulation and common law; negligence, gross negligence personal injury and/or tortious conduct; all tort, intentional tort, and contract (express or implied) claims; any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make the Agreement not binding; and all other claims or causes of action whatsoever which you may have now or in the future arising out of your employment relationship with the Released Parties, or otherwise, whether presently known or unknown, against the Released Parties on or before the time of your execution of this Agreement. Additionally, this release excludes any claim that cannot be released by private agreement. Notwithstanding the above, the Parties agree that this Agreement does not release any workers' compensation claims including, but not limited to Employee's current claims venued before the California Workers' Compensation Appeals Board with case numbers ADJ9967738 and ADJ9967566.

THIS AGREEMENT DOES NOT ℓ RELEASE ANY LONG TERM DISABILITY (ERISA) CLAIMS AND ANY OTHERS THROUGH UNUM.
HK

(d)  Full Release: Further, in signing this Agreement, which includes the release of claims set forth in the paragraph above ("Claims"), you represent that you are doing so with full knowledge of any and all rights which you have and that you have not relied on any representations made by the Company with regard to this Agreement. You expressly waive and relinquish all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and does so understanding and acknowledging the significance of such a specific waiver of Section 1542, which section states as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Released Parties, you expressly acknowledge that this Agreement and the release of claims included in it is intended to include in its effect, without limitation, all Claims which you do not know or suspect to exist in your favor at the time of execution hereof, and that this Agreement and such release of claims contemplate the extinguishment of all such Claims.

This release does not extend to any workers' compensation claims, AND ANY LONG TERM DISABILITY (ERISA) OR RELATED CLAIMS THROUGH UNUM.  HK

10.  Severance Program Disclosure. You acknowledge that, if you are age 40 or over, the Company provided you a document entitled "Disclosure of Information Related to Severance Program" on the same date that you received this General Release.

11.  Miscellaneous. The validity of this Agreement shall be construed under California law. The parties agree that this Agreement supersedes any and all prior agreements or understandings, written or oral, pertaining to Employee's employment and its termination and all related matters excluding only agreements between Employee and the Company or any of the other Affiliates with respect to confidentiality, non-solicitation of clients or employees or other restrictions and loans, if any, to Employee from the Company or any of the other Affiliates, or from any of their respective employee benefits plans, that are outstanding on the date you sign this Agreement, all of which shall continue in full force and effect in accordance with their terms. No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist. This Agreement cannot be changed orally, but may be changed only through written addendum executed by all parties. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Company. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

12.     Assurances: In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms and that you have had a full and sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney or any of the other Persons listed in the second sentence of Section 7(a) of this Agreement, should you wish to do so; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

13.     Complete Terms: This Agreement sets forth the final and complete terms of the agreement between Employer and Employee regarding Employee's termination of employment, and any compensation or other alleged or potential claims of Employee against Employer, asserted or unasserted.

Hakan Kip Kennedy has read and understands the Agreement set forth above. Employee accepts the consideration stated above and agrees to be bound by the terms of this Agreement.

Formalities aside, I want to thank you on behalf of the Company for your service and to wish you well in your future career.

Sincerely,

Andrea Wilson
Chief People Officer

Accepted and agreed:

Signature: _____

Name (please print):  HAKAN  KIP  KENNEDY

Date:  10 / 12 / 2015

PLEASE  SEE  REMARKS  ON  ALL  PAGES  OF  AGREEMENT

6

### Disclosure of Information Related to Severance Program

Columbus Manufacturing, Inc. ("Columbus" or the "Company") is terminating your employment as part of a reduction in force. The Company is offering each employee who will be laid off as part of this reduction in force the opportunity to receive certain "Severance Benefits," as defined in the Severance Agreement ("Agreement"), in exchange for, among other terms, the affected employee's agreement to release any and all legal claims he or she may have against the Company. The release of legal claims is set forth in the Agreement accompanying this disclosure document.

Under the federal Age Discrimination in Employment Act ("ADEA"), employees age 40 or over who are offered severance pay in exchange for releases of legal claims as part of a standard program are entitled to receive certain information related to the program. This document provides that required information.

1.  **Eligibility for Severance:** All persons being laid off as part of the current reduction in force are eligible for Severance Benefits.

2.  **Time Limits for Decisions:** All persons who are being offered Severance Benefits must sign the Company's proposed general release and return it to the Human Resources Department. Employees may take up to 45 days after receiving the general release to sign and return it. Once the general release has been signed, Employee may revoke the agreement within seven days of signing.

3.  **Factors Considered in Selection Decisions:** Employees were selected for the current reduction in force based on the Company's assessment of its business needs. In some circumstances, positions were eliminated without retaining employees who performed similar functions. In other circumstances, the Company selected positions for elimination from among individuals performing similar functions. The considerations that the Company used when selecting from among individuals who performed similar functions were its assessments of skills, knowledge, experience, responsibilities and job performance in light of the Company's business needs.

4.  **Listing of Persons Selected and Not Selected:** Under ADEA, employees who are age 40 or over are entitled to certain information about other employees who are being laid off and are being offered Severance Benefits. The information to be provided covers all persons in the "decisional unit" for the current reduction in force. The "decisional unit" is the portion of the Company's organization from which the Company decided who would be selected for the reduction in force and therefore offered Severance Pay and who would not. The decisional unit is the Operations group of the Company. The following lists the ages and job titles of all persons in the decisional unit who were and were not selected for the reduction in force and Severance Benefits eligibility:

7

| Job Title | Age | No. Selected | No. Not Selected |
|---|---|---|---|
| Associate Director, Co-Manufacturing | 50 | 0 | 1 |
| Associate Director, Engineering | 39 | 0 | 1 |
| Director of Engineering | 44 | 0 | 1 |
| Director of Quality Assurance | 55 | 0 | 1 |
| Facilities Engineer | 62 | 1 | 0 |
| Sr. Maintenance Manager | 40 | 0 | 1 |
| Maintenance Manager | 51 | 0 | 1 |
| Plant Manager | 65 | 1 | 0 |
| Plant Manager | 47 | 0 | 1 |
| Sr. Plant Manager | 57 | 0 | 1 |
| QA Plant Manager I | 35 | 0 | 1 |
| QA Plant Manager I | 36 | 0 | 1 |
| QA Plant Manager II | 45 | 1 | 0 |
| Salame Fermentation Manager | 65 | 0 | 1 |
| Sanitation Supervisor | 51 | 1 | 0 |
| Sr. Mgr, Environ Comp, Infrastructure, Safety | 46 | 0 | 1 |

Updated as of Date: July 10, 2015

Firmwide:133912555.1 065840.1000

 Gmail

**Kip kennedy <kiphkennedy@gmail.com>**

## RE: Severance agreement offer?

**Andrea Wilson** <awilson@columco.com>                    Mon, Oct 5, 2015 at 4:40 PM
To: Kip kennedy <kiphkennedy@gmail.com>

Hello Kip.

Our last offer to you was our final and best offer, and we will not be accepting any of your proposed
modifications. Whether or not you accept that final agreement is entirely up to you, but please remember
that in order to receive the severance payments we have offered, you need to sign and return the revised
agreement we sent you on August 27, 2015, by no later than October 12, 2015.  Please address your
agreement to <u>ATTN: Andrea Wilson 30977 San Antonio Street, Hayward CA, 94544.</u>

Once I have received the executed agreement I can begin administering payments.  We will need to
reconnect so that I may verify your specified method of payment.

Important - I also have your final paycheck which I need to get to you, as per my last several emails to you.  I
attempted delivery but there were no tenants at the address.  I am unable to read the new address you've
written in here in your attachment.  Your final paycheck will  need to be sent to an address where someone
can sign for it.  It cannot be sent to a PO box.  Where can I send your final paycheck, where there will be
someone available for receipt and signature?

Please get back to me as soon as you can, with direction.   Thank you Kip.

ANDREA WILSON  |  COLUMBUS FOODS

MOBILE 415.717.8316

@ptus
COURT REPORTING
Exhibit: _13_
Witness: _Kennedy_
Date: _12·28·17_

**From:** Kip kennedy [mailto:kiphkennedy@gmail.com]
**Sent:** Monday, October 26, 2015 9:36 AM
**To:** Andrea Wilson
**Subject:** Address change and an important request

Dear Andrea

I just wanted to inform you my official address change. Please update my address to the address below by tomorrow on company's records.

3117 RAVENSLAKE CIR.

LEAGUE CITY, TX 77573

Also since my residency is changed to Texas by tomorrow, please do not have the payroll department deduct California taxes on my severance bi-weekly and lump sum payments. Texas has no income taxes.

I also have an important request from you for your help. Since I have officially accepted the company's severance agreement terms proving I have nothing against the company, I respectfully request your help to advice and encourage Tom Widner and any other witnesses to tell only the truth, nothing but the truth, about the work accidents that I had which were witnessed by those. This will help my claim to be processed much faster. But if it goes further with litigation, the witnesses will testify under oath and possibly in front of a judge and making false statements will have serious legal consequences.  So now, this is Tom's chance to tell you and report the truth before the case goes forward and much serious with the legal process.

Thank you for your help

Kip

**4 attachments**

**image004.png**
1K

**image001.png**
1K

**image003.png**
1K

**image002.png**
1K

*@ptus*
COURT REPORTING

Exhibit: _14_
Witness: _Kennedy_
Date: _12·28·17_

12/10/2017
Case 3:17-cv-03379-EMC  Document 59-1  Filed 02/08/18  Page 90 of 105
Gmail - Re: Address change and an important request

 **Gmail**

Kip kennedy <kiphkennedy@gmail.com>

---

## Re: Address change and an important request
1 message

---

**Andrea Wilson** <awilson@columco.com>
To: Kip kennedy <kiphkennedy@gmail.com>
Cc: Ce Ce Sarmiento <csarmiento@columco.com>

Wed, Oct 28, 2015 at 10:45 AM

Kip,

I checked with our CFO and we are able to pay the sum as per your direction.

CeCe, please proceed.

Thank you.

Andrea

On Oct 27, 2015, at 4:17 PM, Kip kennedy <kiphkennedy@gmail.com> wrote:

> Hi Ce Ce,
>
> 1. Per agreement, the lump sum amount to be paid immediately is $█████ You can make the lump sum payment
> of $█████ by the end of October.
> 2. Also $█████ should be paid in ten(10) bi-weekly payments period or in twenty(20) weeks.You can start the bi-
> weekly payments by next pay day on November and continue through 20 weeks or 5 months.
> Could you please make sure that California State Tax is not deducted from the lump sum and from the bi-weekly
> payments as I am a residence of Texas now where there is no state income tax?
>
> Thanks for your help
> Kip
>
> On Tue, Oct 27, 2015 at 5:13 PM, Ce Ce Sarmiento <csarmiento@columco.com> wrote:
>
>> Kip,
>>
>>
>> As per the executed agreement, Columbus will be paying out a lump sum amount of $█████ Per your
>> request, we will deposit the net amount to your financial institution below on November 13, 2015:
>>
>>
>> Transit ABA Number: ██████████
>>
>> Bank Deposit Account Number: ██████████
>>
>>
>> Regards,
>>
>>
>>
>> CE CE SARMIENTO | PAYROLL MANAGER
>>
>> COLUMBUS FOODS
>>
>> TEL 510.921.3404  FAX 510.491.1055
>>
>> 30977 San Antonio Street, Hayward, CA 94544

*@ptus*
COURT REPORTING

Exhibit: _23_
Witness: _Kennedy_
Date: _12·28·19_



**Employment
Development
Department**
State of California

## Notice Of Computation (DE 429D)

| Issue Date: | 06-27-2014 |
|---|---|

This notice does not establish your right to benefits. State Disability Insurance or Paid Family Leave benefits are paid to you only when you meet all the conditions of eligibility.

### Claimant Information

| Name: | HAKAN KIP KENNEDY | Address: | 308 Clarescastle Way<br>Vacaville, CA 95688-9393<br>United States |
|---|---|---|---|
| Social Security Number: | ▉▉▉▉▉▉ | ECN: | |
| EDDCAN: | 9785166480 | Claim ID: | DI-1001-513-559 |

### Benefit Information

| Your Maximum Benefit Amount is ($): | 55900.00 | Your Weekly Benefit Amount is ($): | 1075.00 |
|---|---|---|---|
| Your Daily Benefit Amount is ($): | 153.57 | Your Claim Effective Date: | 06-02-2014 |

### Wage Information

| Your Name | Employer | Jan-Mar '13 ($) | Apr-Jun '13 ($) | Jul-Sep '13 ($) | Oct-Dec '13 ($) |
|---|---|---|---|---|---|
| *HAKAN K KENNEDY | COLUMBUS MANUFACTURING INC | 33,307.33 | 25,000.86 | 21,429.33 | 25,165.07 |
| | | | | | |
| Quarter Total: | | 33,307.33 | 25,000.86 | 21,429.33 | 25,165.07 |
| Total Wages ($): | 104,902.59 | | | | |

You should:

    1. See that your Social Security Number (SSN) is correctly shown.
    2. Check any of the wages listed which you did not earn.
    3. Check for any wages subject to the California Unemployment Insurance Code paid you during the quarters shown that are not listed.

@ptus
COURT REPORTING
Exhibit: 24
Witness: Kennedy
Date: 12.28.17

12/10/2017

Case 3:17-cv-03379-EMC   Document 59-1   Filed 02/08/18   Page 92 of 105
Gmail - Re: No mutual Agreements in preparation for termination date of August 29, 2015

 Gmail

**Kip kennedy <kiphkennedy@gmail.com>**

---

## Re: No mutual Agreements in preparation for termination date of August 29, 2015
1 message

---

**Kip kennedy** <kiphkennedy@gmail.com>
To: Andrea Wilson <awilson@columco.com>

Wed, Sep 23, 2015 at 8:47 PM

Andrea,

I have attached the copy of the modified severance agreement in order for me to accept this agreement.
Please let me know what you think

Kindest Regards
Kip

**@ptus**
COURT REPORTING
Exhibit: _28_
Witness: _Kennedy_
Date: _12·28·17_

On Tue, Sep 15, 2015 at 11:23 AM, Kip kennedy <kiphkennedy@gmail.com> wrote:
Andrea,

Additional to info that I have sent you with e-mail below, your termination action of me while on medical leave; will be also a
violation of California Labor Code 132(a). The termination action is also a retaliation against me for reporting a work injury and
filing a worker's compensation claim.
So basically your termination action on me; is a violation of EEOC, ADA, California Labor Laws, Rules and Regulations based
on facts and legal documents.
But if you don't care to be in violation of laws and still want to proceed to termination action on me, then please sign the
termination letter by stating any legally valid termination reasons(if you have any) on that letter and please e-mail me back.

Thanks
Hakan Kip Kennedy

On Fri, Aug 28, 2015 at 1:38 PM, Kip kennedy <kiphkennedy@gmail.com> wrote:
Andrea,

At this point, I need to be very direct with you about the problems with and consequences due to your planned termination
action on me.
As I am protected by law with EEOC and ADA rules and regulations; your termination intention about me constitutes two major
problems.
1. As you are well aware of it, I am currently on medical leave due to a work injury(work injury notification on September 2013)
and I have notified the company for an extension of my medical leave until the end of 2015. Based on my medical condition,
the doctors may extend the medical leave or may return me to do a sedentary job or may permanently disable me from any
job. We are not at that point yet and I would inform the company by the end of 2015. If able to return to sedentary job, by law;
the company is obligated to accommodate me for a sedentary job or at least try to accommodate. You should wait for
severance agreement discussions and offer until I physically return the company or until I let you know that if I will not be able
to return. Since you don't want to wait and are not taking the proper steps, you are violating the law referring to ADA(American
Disability Act)
2. Since November 2013 you have presented me several severance agreement offers which were all rejected referring to your
intention of terminating me on August 29, 2015. I have asked many times the reason or reasons and you have given reasons
from plant closure therefore layoff, job elimination and reorganization but you haven't responded with any valid reasons and
haven't presented or shared any legal proof/document with details to justify your decision. All reasons you have given are;
invalid due to the facts that the South San Francisco plant is closing but the company is opening a new plant at Hayward with a
$30M investment around the corporate area and all management except me; are all transferred to the new plant,
All employees at closing South San Francisco plant; were even given opportunity to apply or to be transferred to other jobs in
the company before laid off, still except me. I am the only person, in the company's whole QA Department, to be terminated
and there is no job elimination, the job still exists at the new plant and in all company plants and where the processes were
transferred. So the layoff, job elimination and reorganization reasons are not valid. This is totally an organized plan to eliminate
me and this termination is based on unlawful reasons and by doing this; you are violating the EEOC laws and regulations.
I have to remind you that the consequences of this termination action will be massive law suits and will have major impact on
the company financially.
Under these circumstances, you cannot terminate me legally today. As of today, there no mutual agreements.
But if you still terminate me today, that will be; a dismissal(firing) and involuntarily terminating an exempt employee with no
valid legal reason and that's illegal. I take this opportunity to friendly warn you before committing an illegal act by proceeding to
termination process today.
Then I also have to appeal to Arbor Investments(financially owner of Columbus Salame) and let them know these law suits will
have major financial impact on them as well before starting legal process with EEOC and with my employment attorney.

Thanks for your attention
Hakan Kip Kennedy

On Thu, Aug 27, 2015 at 6:53 PM, Andrea Wilson <awilson@columco.com> wrote:

Kip,

I am hoping you are receiving my emails. I am looking for you to verify your physical address so I may send important original copies where I know you will receive them. I still have your address as 832 Derry Circle. Please confirm as soon as you can.

Attached please find your Benefits Term Letter and the Severance Agreement. As discussed in many communications with you, starting from November 2013, the company has undergone a 36 month plant closure project and the plant you have been employed by is formally now closing. Your separation from Columbus is as a result of a company reorganization and hence, a job elimination.

I was hoping to discuss these details in person or via phone conversation, but you have requested to remain on email.

Please review the documents and if you have any question at all, please do not hesitate to call me at 

You have unused PTO hours and we will be mailing these out to you in a final (live) paycheck, along with original copies of the attachments above. Should you need these documents sent to a new/different address I would need to know that as soon as possible.

Thank you Kip.

ANDREA WILSON  |  CHIEF PEOPLE OFFICER

COLUMBUS FOODS



30977 San Antonio Street, Hayward, CA 94544

http://www.ColumbusSalame.com

📘 🐦 📷 📧

📄 **SEVERANCE AGREEMENT OFFER UPDATED 9-23-2015.pdf**
734K

Gmail - FW: Agreements in preparation for termination date of August 29, 2015

 **Gmail**

**Kip kennedy <kiphkennedy@gmail.com>**

---

## FW: Agreements in preparation for termination date of August 29, 2015
1 message

---

**Andrea Wilson** <awilson@columco.com>
To: "kiphkennedy@gmail.com" <kiphkennedy@gmail.com>

Wed, Oct 14, 2015 at 12:21 PM

---

Kip,

Due to the nature of this legally binding document, we can only accept the original, unaltered clean copy (see attached again, document called K. Kennedy Updated Severance Agreement 8.27.15).

I will attempt here to address the comments/questions you wrote in, so that you better understand.

**@ptus**
COURT REPORTING

Exhibit: _29_
Witness: _Kennedy_
Date: _12·28·17_

### RE: Address

Thank you for offering up your attorney's office as a receipt location for your final wages and PTO check.  As mentioned, we cannot send live checks unless they can be accepted and signed for.  I think this is a good option.  I will resend the originally sent Fed Ex to this address:  1390 market Street, Suite 1200, San Francisco, CA 94102.  ATTN:  Alexander Ennis, Attorney at Law.  Please alert Mr. Ennis that this is coming.  Thank you.

### Re: Section 2 of the Severance Agreement, called Affirmations

We have indeed paid your final wages and PTO, exactly on time, at the time of formal separation on August 29th.  I then made several attempts to contact you once the Fed Ex was returned due to 'no live person to sign'.  It is the responsibility of the employee to offer up the correct address and/or come in live to receive check.  So, as referenced in the paragraph above, I will re-send again to your attorneys address.

### Re: Section 9, Release of Claims, paragraph C

UNUM is a voluntary product of which you are currently participating.  This agreement is not connected to any UNUM programs.  This agreement also does not affect your current workers compensation /disability claim.

### Re: Your payment instructions for Severance

Once you have signed this agreement, in its original state (K. Kennedy Updated Severance Agreement 8.27.15), we must wait seven days before we can deposit in your bank account.  We can do direct deposit, per your request.  Direct deposit runs on a bi-weekly payroll schedule.  The next schedule will drop on 10/29/15.  This agreement was due on Monday, October 12, 2015.  Provided you resign the clean copy agreement today, we will allow the 7-day legal revocation waiting period, and you will still fit inside the 10/29/15 payroll cycle.

### Re: Bank Account for Deposit

I have verified through Payroll at Columbus, we still have your direct deposit account information as .... Checking Account, account number last 4 digits 0133.  Please confirm that you still have the same active bank, same checking

account open. Thanks.

Kip, please do sign the original clean copy of this agreement in order to allow Columbus to execute your severance as per your request. I will accept a newly signed, unaltered document even though it is now past due, given that you made an attempt to return on time. Verify the bank account information and ensure you have explained to Mr. Ennis that you will have a piece of mail waiting for signature this Monday, October 19, 2015. Thank you again, Andrea.

---------------------------------------------------

Wednesday, 10/14 7:24

Andrea,

I will be in the process of moving and I will let you know my new address by the end of this month. You can have payments started by November 1st to the same account that I have received my salary last year. In the meanwhile you can send my last check including my vacation hours pay to the PO Box mailing address below and when I receive the check , I will confirm with an email notification and when the check is cashed, it will be officially confirmed. If you still want to have somebody sign the mail, then I will be at my worker's comp and doctor's office next week at San Francisco, you can have it delivered to my attorney's office address below by next Monday evening and I can receive from him next Tuesday morning. Please see addresses below.

My Mailing address

PO Box 1962

Davis, CA 95617

Attorney's address

Alexander Ennis, Attorney at Law

**1390 Market Street, Suite 1200**
**San Francisco, CA 94102**

Thanks

Kip

On Tue, Oct 13, 2015 at 9:53 AM, Andrea Wilson <awilson@columco.com> wrote:

Thank you Kip.  I am in receipt of your response and will begin executing the agreement.

Hold and I will be back to you today with payment particulars.  I do need a live recipient (a real person) to receive your final paycheck.  As you recall, we've attempted to send that final pay package to you but the package was returned.  I still have it in tact in my drawer.  Do you have any address where you know someone can receive the package?

ANDREA WILSON  |  COLUMBUS FOODS

MOBILE 415.717.8316

**From:** Kip kennedy [mailto:kiphkennedy@gmail.com]
**Sent:** Monday, October 12, 2015 8:16 PM
**To:** Andrea Wilson
**Subject:** Updated severance agreement offer

Andrea,

Please see attached signed agreement.

Happy Columbus Day!

Thanks

Hakan Kip Kennedy

**From:** Andrea Wilson
**Sent:** Thursday, August 27, 2015 4:54 PM

# Exhibit B

1  Natalie A. Pierce, Bar No. 191342
   npierce@littler.com
2  Lisa K. Horgan, Bar No. 267632
   lhorgan@littler.com
3  Paul E. Goatley, Bar No. 305606
   pgoatley@littler.com
4  LITTLER MENDELSON, P.C.
   333 Bush Street
5  34th Floor
   San Francisco, California 94104
6  Telephone:   415.433.1940
   Facsimile:    415.399.8490
7
   Attorneys for Defendants
8  COLUMBUS MANUFACTURING, INC. and
   ANDREA WILSON
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  HAKAN KIP KENNEDY,                     Case No.  3:17-cv-03379-EMC

14                  Plaintiff,             **DEFENDANTS' SPECIAL
                                           INTERROGATORIES TO PLAINTIFF,
15          v.                             SET ONE**

16  COLUMBUS MANUFACTURING, INC.
    AND ANDREA WILSON,
17
                    Defendants.
18

19

20  PROPOUNDING PARTY:          Defendants COLUMBUS MANUFACTURING, INC. AND
                                ANDREA WILSON
21

22  RESPONDING PARTY:           Plaintiff HAKAN KIP KENNEDY

23  SET NUMBER:                 ONE

24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

DEFENDANTS' SPECIAL INTERROGS, SET ONE                    (Case No. 3:17-cv-03379-EMC)

TO PLAINTIFF HAKAN KIP KENNEDY

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure, Rule 33 Defendants Columbus Manufacturing, Inc. ("Columbus") and Andrea Wilson ("Wilson") (collectively, "Defendants") hereby request that Plaintiff Hakan Kip Kennedy respond in writing, under oath, to the following specially prepared interrogatories within thirty (30) days of service hereof. The requested responses are to be produced at the law offices of Littler Mendelson, 333 Bush St., 34th Floor, San Francisco, California, 94104.

## DEFINITIONS AND INSTRUCTIONS:

1. The terms "Plaintiff," "you" or "your" refers to Plaintiff Hakan Kip Kennedy and his agents and assignees.

2. The term "Defendants" refers to Columbus Manufacturing, Inc. ("Columbus") and Andrea Wilson ("Wilson").

3. The term "Complaint" means the Complaint for Damages filed by HAKAN KIP KENNEDY in the United States District Court, Northern District of California, on or about June 5, 2017, Case No. 3:17-cv-03379-EMC.

4. The term "Agreement" refers to the severance agreement you signed on or around October 2015 concerning the separation of your employment from Columbus, including any and all versions created, whether in draft or final form.

5. "Identify" with respect to a natural person means to state the name, address (including street address, city, state and zip code) and telephone number of the person being identified. "Identify" with respect to a document shall mean to state its date, author or signer, its address, type of document, and all other means of identifying it and its present or last know location or custodian.

6. These interrogatories are continuing in nature, and Plaintiff is under a duty to supplement his responses with any additional information requested herein that is unavailable upon the initial date for the responses to these interrogatories.

7. In answering the interrogatories, which follow Rule 33 of the Federal Rules of Civil Procedure, Plaintiff shall furnish all information in the possession of Plaintiff's agents, representatives, employees, investigators, attorneys, or any person acting on Plaintiff's behalf and

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

DEFENDANTS' SPECIAL INTERROGS, SET ONE    2.    (Case No. 3:17-cv-03379-EMC)

1  not merely such information known to Plaintiff's personal knowledge. If Plaintiff cannot answer the

2  following interrogatories in full, after exercising due diligence to secure the information to do so, so

3  state, and answer to the extent possible, specifying Plaintiff's inability to answer the remainder and

4  stating whatever information or knowledge Plaintiff has concerning the unanswered portions.

5  **SPECIAL INTERROGATORIES**

6  **SPECIAL INTERROGATORY NO. 1:**

7          Identify by name, last known address, and telephone number each and every person

8  who has any knowledge of any of the facts supporting your allegation that the Agreement is

9  unenforceable.

10  **SPECIAL INTERROGATORY NO. 2:**

11          Identify by name, last known address, and telephone number, each and every person

12  and/or entity, aside from any attorney you may have consulted with on this matter, with whom you

13  have had communications, whether written or oral, concerning the enforceability of the Agreement.

14  **SPECIAL INTERROGATORY NO. 3:**

15          Identify by name, last known address, and telephone number, each and every person

16  and/or entity, aside from any attorney you may have consulted with on this matter, with whom you

17  have had communications, whether written or oral, concerning the closure of Columbus' South San

18  Francisco plant.

19  **SPECIAL INTERROGATORY NO. 4:**

20          Identify by name, last known address, and telephone number, each and every person

21  whose employment was terminated as the result of the closure of Columbus' South San Francisco

22  plant in 2015.

23  **SPECIAL INTERROGATORY NO. 5:**

24          Identify each and every occasion between May 2014 to the present in which

25  Defendants requested that you sign the Agreement. "Identify," as used herein, means to state, for

26  each such occasion: (1) the date on which the request was made, (2) who made the request, (3) how

27  the request was communicated to you (for example, telephone, email, in-person conversation), and

28  (4) what was said to you by the individual communicating the request.

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

DEFENDANTS' SPECIAL INTERROGS, SET ONE    3.       (Case No. 3:17-cv-03379-EMC)

1 **SPECIAL INTERROGATORY NO. 6:**

2          Identify each and every occasion between May 2014 to the present in which you

3 rejected the Agreement. "Identify," as used herein, means to state, for each such occasion: (1) the

4 date on which you rejected the Agreement, (2) to whom you communicated the rejection of the

5 Agreement, and (3) what was said to you by the individual to whom you communicated the

6 rejection.

7 **SPECIAL INTERROGATORY NO. 7:**

8          State all facts upon which you base the contention that you signed the Agreement as a

9 result of "undue influence."

10 **SPECIAL INTERROGATORY NO. 8:**

11          State all facts upon which you base the contention that you signed the Agreement as a

12 result of "financial hardship."

13 **SPECIAL INTERROGATORY NO. 9:**

14          State all facts upon which you base the contention that the Agreement is

15 unenforceable.

16

17 Dated: November 13, 2017

18

19 NATALIE PIERCE
    LISA HORGAN

20 PAUL GOATLEY
    LITTLER MENDELSON, P.C.

21 Attorneys for Defendants
    COLUMBUS MANUFACTURING, INC. and

22 ANDREA WILSON

23 Firmwide:151153940.1 065840.1021

24

25

26

27

28

LITTLER MENDELSON, P.C.
333 Bush Street
34th Floor
San Francisco, CA 94104
415.433.1940

# Exhibit C

1 | Your name:  HAKAN KIP KENNEDY

2 | Address:_____11812 LAKE BLVD_____

3 | TRINITY, FL 34655_____

4 | Phone Number:__(727)221-8134_____

5 | E-mail Address:_kiphkennedy@gmail.com_____

6 | Pro se

7 |

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | Division *[check one]*: ■ San Francisco □ Oakland □ San Jose □ Eureka

11 |

12 | HAKAN KIP KENNEDY_____        )        Case Number: 17-cv-03379-EMC_____

13 | _____        )

14 | Plaintiff,        )

15 | vs.        )

16 | COLUMBUS MANUFACTURING, INC.__        )

17 | _____        )

18 | _____        )

19 | _____        )

20 | _____        )

21 | Defendant.        )

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CASE NO.: _____17-cv-03379-EMC_____; PAGE __1__ OF _2_

**RESPONSE TO DEFENDANT'S SPECIAL INTERROGATORIES TO PLAINTIFF SET ONE**

1. None
2. Communicated to the EEOC during EEOC complaint process
3. Only EEOC and former company people
4. As far as I know, I was the only management person terminated due to the result of plant closure
5. Please see attached Exhibit C communication documents and see my e-mail on July 11, 2015; summarizing the events related to the question and further communication e-mails from Andrea Wilson during July through November 2015
6. Please see attached Exhibit C documents relating to communication of agreements proposals by Andrea Wilson and rejections by me as the plaintiff
7. Please see attached Exhibit E legal reference documents
8. Please see Exhibit D financial documents relating to the financial hardship caused by no income around the termination date period
9. Please see attached Exhibit E legal reference documents regarding the unenforceable agreements due to undue influence, improper conduct, duress, financial hardship, fraud, unconscionability, violation of federal and state laws/regulations/rules etc. and the circumstances and conditions during the agreement process.

CASE NO.: _____17-cv-03379-EMC_____; PAGE __2__ OF __2__

Justice & Diversity
CENTER
OF THE BAR ASSOCIATION OF SAN FRANCISCO

## CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

*\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve. \**

1. **Case Name:** HAKAN KIP KENNEDY _____ v. COLUMBUS MANUFACTURING

2. **Case Number:** 17-cv-03379-EMC

3. **What documents were served?** *[Write the full name or title of the document or documents]* DOCUMENTS REQUESTED BY DEFENDANT, RESPONSE TO INTERROGATORIES BY DEFENDANT

4. **How was the document served?** *[check one]*

   ☑ Placed in U.S. Mail

   ☐ Hand-delivered

   ☐ Sent for delivery (e.g., FedEx, UPS)

   ☐ Sent by fax (if the other party has agreed to accept service by fax)

5. **Who did you send the document to?** *[Write the full name and contact information for each person you sent the document.]*

   | | |
   |---|---|
   | | Columbus Manufacturing, Inc.'s Attorney |
   | | Lisa Horgan , PAUL GOATLEY |
   | | 333 Bush St. 34th Floor |
   | | San Francisco, CA 94104 |

6. **When were the documents sent?** 12/14/2017

7. **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

   Signature: _____

   Name: HAKAN KIP KENNEDY

   Address: 11812 LAKE BLVD, TRINITY, FL 34655

   _____

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*