United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAKAN KIP KENNEDY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COLUMBUS MANUFACTURING, INC., et al.,<br><br>　　　　Defendants. | Case No. 17-cv-03379-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 59 |

## I.　　INTRODUCTION

*Pro se* plaintiff Hakan Kip Kennedy (hereafter "Mr. Kennedy") brought this employment discrimination action alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), and the Discrimination in Employment Act of 1967 ("ADEA").[1] Defendants are his former employer Columbus Manufacturing, Inc. (hereafter "Columbus") and its Vice President of Human Resources Andrea Wilson (hereafter "Wilson") (collectively "Defendants").

Mr. Kennedy alleges he was laid off from Columbus in August 2015 as part of a reduction in force ("RIF") due to the closure of Columbus' South San Francisco facility ("Forbes Plant"). *See* Docket No. 59 at 6. Following the elimination of his position and extensive negotiations, Mr. Kennedy signed a written severance agreement with Columbus. *Id*. By signing the severance agreement Mr. Kennedy agreed to release "any and all claims arising from or related to [his] employment" with Columbus, including claims for age and disability discrimination. *Id*. Mr. Kennedy received a severance payment of $54,798.04 in exchange for his release. *See* Docket No.

---

[1] Mr. Kennedy also alleged in his Complaint violations of Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963. Both claims were dismissed with prejudice by the Court on October 18, 2017. *See* Docket No. 43.

59-2 ("Wilson Decl."), Exh. I ¶ 1. After signing the severance agreement, he brought the instant lawsuit. Defendants argue that Mr. Kennedy is bound by the terms of the severance agreement, and is therefore barred from asserting the claims herein. *Id* at 7. The Court finds that the severance agreement is valid and enforceable, and hereby **GRANTS** Defendants Motion for Summary Judgment.

## II.  FACTUAL BACKGROUND

Mr. Kennedy was employed by Columbus as a Quality Assurance Manager in Columbus' Forbes Plant from January 9, 2012, to August 29, 2015. *See* Docket No. 1 ("Compl."), Attach. 1, at 5; *see also* Docket No. 59 at 8. In September 2013, Mr. Kennedy contacted Columbus regarding safety concerns and notified them of his workplace injury. *Id.* Some months later, Mr. Kennedy began working part time and subsequently took medical leave. *Id.* In November 2013, due to a reorganization of its business operations, Columbus made the decision to close its Forbes Plant, which resulted in the elimination of Mr. Kennedy's position. *See* Wilson Decl. at ¶ 2. After Mr. Kennedy rejected several severance offers from Columbus in 2014 and 2015, Columbus informed Mr. Kennedy that his employment would be terminated effective October 12, 2015, whether or not he agreed to severance. *Id.* On October 20, 2015, after eight months of negotiations, throughout which Mr. Kennedy says he consulted one or more attorneys, Mr. Kennedy signed the severance agreement ("Final Agreement"),[2] which provides that:

> 9. Release of Claims
>
> ****
>
> (c) In consideration for the payments set forth in this Agreement and other terms of this Agreement, except for the rights and the obligations created by this Agreement, Employee on Employee's own behalf and on behalf of Employee's heirs, beneficiaries, executors, administrators, representatives and assigns, and all others connected with or claiming through Employee, Employee hereby fully, finally and completely release and forever discharge, acquit, relinquish and hold harmless the Company and the other Affiliates

---

[2] The Final Agreement included the same Severance Payment offered in both the May Agreement and the June Agreement ($39,423.04) and an additional sum of $15,375.00. *See* Wilson Decl. ¶ 3. The additional sum in the Final Agreement was added as a direct result of Plaintiff's negotiating efforts. *Id.*

2

> and all of their respective past, present and future officers, directors, shareholders, general and limited partners, joint venturers, members, managers, employees, agents, predecessors, successors and assigns, and all other Persons connected with any of them (all, collectively, the "Released Parties"), both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, arising from facts or events occurring on or before the effective date of this Agreement. The foregoing release covers, without limitation, any and all claims arising from or related to your employment with the Released Parties such as claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq.; **the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

*See* Docket No. 59-2, ("Wilson Decl."), ¶ 17, Exh. N (emphasis added). Further, at Plaintiff's insistence during negotiations, the Final Agreement explicitly excluded his workers' compensation claims from the Release of Claims:

> Notwithstanding the above, the Parties agree that this Agreement does not release any workers' compensation claims including, but not limited to Employee's current claims venued before the California Workers' Compensation Appeals Board with case numbers ADJ9967738 and ADJ9967566. Workers' Compensation Appeals Board with case numbers ADJ9967738 and ADJ9967566.

*Id.* (emphasis added). The Final Agreement also advised Mr. Kennedy to carefully consider the terms of the agreement and to consult an attorney before signing:

> (a) The Company wants to be certain that this Agreement will resolve any and all concerns that you might have and therefore requests that you carefully consider its terms, including the release of claims contained in Section 9(c) below. This Agreement creates legally-binding obligations and the Company therefore advises you to consult an attorney before you sign it.
>
> \*\*\*\*

*Id.* (emphasis added).

Lastly, the Final Agreement advised Mr. Kennedy he had forty-five (45) days to consider the agreement before signing, and seven (7) days to revoke after execution. *Id.* Mr. Kennedy took fifty four (54) days to consider the Final Agreement, and never attempted to revoke after

execution.[3] After signing the Final Agreement, Mr. Kennedy emailed Ce Ce Sarmiento, Columbus' Payroll Manager, to instruct her to pay the Severance Amount as follows: (1) $15,375.00 to be paid in a lump sum, and (2) $39,423.04 to be paid in ten (10) installments every other week. *See* Wilson Decl. ¶ 18. Ms. Sarmiento informed Mr. Kennedy that Columbus would agree to pay him as instructed.[4] *Id.* The lump sum was issued to Mr. Kennedy on November 13, 2015, and the installments every other week commenced on November 27, 2015 and concluded on March 31, 2016. *See* Wilson Decl. ¶ 18, Exh. O. Mr. Kennedy confirmed that he received all consideration owed under the Final Agreement. *See* Docket No. 59-1 at 35-36.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the party moving for summary judgment must show the absence of a genuine issue of material fact regarding an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), 248. "The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998); *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.") Once the moving party meets

---

[3] Defendants provided Plaintiff with the Final Agreement on August 27, 2015; he signed it on October 20, 2015. *See* Docket No. 59-1 ("Goatley Decl."), Exh. 9 and Exh. 28; *see also* Wilson Decl. ¶ 12, Exh. I. Mr. Kennedy has never contended that he revoked or attempted to revoke the Final Agreement. *See* Goatley Decl. ¶¶ 3, 4, Exh. B & C. Mr. Kennedy further admitted during his deposition that he did not have any further communication with Ms. Wilson after October 26, 2015 regarding the severance agreement. *See* Docket No. 59-1 at 28-29.

[4] The Final Agreement provides that the entire severance amount will be paid in one lump sum. *See* Wilson Dec. ¶ 17, Exh. N. However, Defendant Columbus accommodated Plaintiff's preferred method of payment. *Id.*

1 this initial burden, the burden shifts to the non-moving party to set forth specific facts
2 demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). That party must set
3 forth such facts as would be admissible at trial and may not merely rest upon conclusory
4 allegations or irrelevant or inadmissible evidence. Fed. R. Civ. P. 56(e); *see also Keenan v. Allan*,
5 91 F.3d 1275, 1278-79 (9th Cir. 1996). If the evidence presented by the plaintiff is merely
6 "colorable," or is not "significantly probative," summary judgment is still appropriate if there are
7 no genuine issues of material facts in dispute. *Id.* at 249-250. All facts are reasonable inferences
8 therefor and drawn in the non-moving party's favor. *See Triton Energy Corp. v. Square D Co.,* 68
9 F.3d 1216, 1221 (9th Cir. 1995).

The interpretation of a settlement agreement (i.e., severance agreement) is governed by the same principles applicable to any other contractual agreement. *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992).[5] Under general contract principles, a proposal for a compromise settlement may constitute a binding if its terms are reasonably certain. *See id.; see also* Rest. 2d Contracts, § 33. As with all contracts, the permissible inquiry into whether the Final Agreement is enforceable generally is limited to the "four corners" of the agreement. *See, e.g., Paddock v. Vasquez*, 122 Cal. App. 2d 396, 400 (1953); *see also Cedars-Sinai Med. Ctr., v. Shewry*, 137 Cal. App. 4th 964, 979 (2006) ("When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible."). "California recognizes the objective theory of contracts…under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation … The parties' undisclosed intent or understanding is irrelevant to contract interpretation." *Cedars-Sinai Med. Ctr.*, 137 Cal. App. 4th at 980 (internal citations and brackets omitted). While the existence of ambiguity would open the door to parol evidence on contract interpretation, there is no such issue here.

---

[5] Federal courts apply state law when determining the enforceability of release agreements. *See Veronda v. California Dep't of Forestry & Fire Prot.*, No. C 99-5244 MMC, 2002 WL 1578879, at *5 (N.D. Cal. 2002), aff'd sub nom. 58 F. App'x 363 (9th Cir. 2003)

5

### IV. **DISCUSSION**

A. <u>Whether the Release in the Severance Agreement Was Valid and Enforceable</u>

Defendants argue that the written release in the Final Agreement extinguishes any obligation that falls within the scope of its terms. *See Skrbina v. Fleming Cos., Inc.*, 45 Cal. App. 4th 1353, 1360 (1996) (action for discrimination and wrongful termination barred by a written release agreement obtained in exchange for severance payment where released covered all claims under state and federal employment laws and regulations.). In the case at bar, each claim Mr. Kennedy now asserts—age and disability discrimination—are specifically enumerated in the release he affirmatively acknowledged.

    1. <u>Whether Mr. Kennedy Is Barred From Bringing a Civil Action After Accepting Proceeds of the Severance Agreement</u>

Mr. Kennedy is suing to rescind the contractual obligations in the Final Agreement. Defendants argue that an employee, like Mr. Kennedy, is barred from bringing a civil action against an employer after accepting the proceeds of a severance agreement, even if such agreement would have been otherwise voidable by the employee. *See e.g.*, *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 426 (1998); *see also Alvarado Cmty. Hosp. v. Superior Court*, 173 Cal. App. 3d 476, 481 (1985) ("a [plaintiff] may not both receive the advantages of an agreement and escape its burdens by later repudiation: 'it would be unfair to allow him both to have his cake and eat it too.'") (internal citation omitted). Defendants also cite California Civil Code, section 1589, which states that, "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Cal. Civ. Code § 1589.

Under California law, in order to bring a claim released by a settlement agreement, a plaintiff must rescind the agreement. *See Village Northridge Homeowners Ass'n v. State Farm Fire and Cas. Co.*, 50 Cal. 4th 913, 917-18 (2010). California Civil Code § 1691 provides that "[w]hen notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or

both." (emphasis added). Where a party seeks to rescind a contract, rescission is not categorically barred simply because that party received consideration under the contract. *See Oubre v, Entergy Operations, Inc.*, stated that, "a person suing to rescind a contract, as a rule, is not required to restore the consideration at the very outset of the litigation." 522 U.S. 426.[6] Where a party such as Mr. Kennedy seeks "relief based upon rescission . . . in an action or proceeding," courts will apply the substantial prejudice standard under California Civil Code § 1693. *See Basco v. Toyota Motor Corporation,* 2011 WL 13127547, Case No. 09-CV-6307-GHK (RZx) (C.D. Cal. 2011). California Civil Code § 1693 provides:

> "A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief based upon rescission shall not be denied relief because of a delay in restoring or in tendering restoration of such benefits before judgment unless such delay has been substantially prejudicial to the other party; but the court may make a tender of restoration a condition of its judgment."

Here, Defendants have not shown substantial prejudice were benefits under the Final Agreement restored. Thus, the Court finds that Mr. Kennedy is not barred from bringing his claims simply because he ratified the final agreement by accepting the severance payments.

B. <u>Whether Mr. Kennedy's Consent Was Obtained Through Economic Duress, Undue Influence, Or That the Release Is Otherwise Improper</u>

Nonetheless, in order to obtain rescission, Mr. Kennedy must prove his consent to the severance agreement was obtained through economic duress, undue influence, or that the release is otherwise improper. Mr. Kennedy must show, *e.g.*, his signature was obtained under conditions of "fraud, deception, misrepresentation, duress, or undue influence." *Skrbina v. Fleming Cos., Inc.*,

---

[6] *Alvorado Cmnty. Hosp. v. Superior Court* is not dispositive as it concerns ratification when an agent enters into an unauthorized contract, the rules related to the law of agency and has little relation to the fact patterns of this case. In *Alvorado Cmnty. Hosp.*, the issue was whether a client, defrauded when her attorney settled a lawsuit without authorization and absconded with the funds, may seek and obtain reimbursement of the settlement proceeds from the State Bar's client security fund (CSF), and at the same time pursue the original lawsuit against the defendant who paid the proceeds to the fraudulent lawyer. The court found that such a client cannot both accept the benefits of her lawyer's negotiated settlement and continue to sue the settling defendant, explaining that the client's acceptance of money from CSF operates as a ratification of the settlement and in the absence of any allegations of bad faith, discharges the defendant from any further liability.

7

45 Cal. App. 4th at 1366.

1. Undue Influence

First, Mr. Kennedy argues that his consent was obtained under undue influence. *See* Docket No. 63 at 24–25. Undue influence may consist of "taking an unfair advantage of another's weakness of mind" or "taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575. In order to establish a claim for undue influence, Mr. Kennedy is required to prove by a preponderance of the evidence that Defendants (1) excessive pressure, i.e., the application of excessive strength to secure an agreement, and (2) there was undue susceptibility, i.e., a weakness of mind that results in a lessened capacity to make a free contract. *Olam v. Cong. Mortgage Co.*, 68 F. Supp. 2d 1110, 1141 (N.D. Cal. 1999).

a. Excessive Pressure Element

Excessive pressure comes with certain characteristics that create a pattern, such as:

> "(1) discussion of the transaction at an unusual or inappropriate time,
> (2) consummation of the transaction in an unusual place,
> (3) insistent demand that the business be finished at once,
> (4) extreme emphasis on untoward consequences of delay,
> (5) the use of multiple persuaders by the dominant side against a single servient party,
> (6) absence of third-party advisers to the servient party, [and]
> (7) statements that there is no time to consult financial advisers or attorneys."

*Johnson v. International Business Machines Corp.*, 891 F. Supp. at 531.

i. Consultation With an Attorney

Here, there is undisputed evidence that Mr. Kennedy consulted with an attorney on multiple occasions prior to signing the severance agreement in October 2015, which suggests that excessive pressure was absent. In February 2015, at the early stages of negotiations, Mr. Kennedy admitted that he "would consult an attorney". *See* Docket 64-1 ("Kennedy Decl.") ¶ 10. In March 2015, Mr. Kennedy stated that he "needed to consult a few attorneys to determine how the release in the severance agreement would affect [his] pending medical and disability claims." Kennedy Decl. ¶ 11. On April 7, 2015, Mr. Kennedy emailed Wilson, stating that, "After consulting and currently finalizing my discussion with several attorneys, I will be able to discuss the agreement

8

United States District Court
Northern District of California

alterations next week sometime through e-mail and I will send you my requests for alterations." Kennedy Decl. ¶ 12, Exh. 10. On July 29, 2015, in another email to Wilson, Mr. Kennedy stated, "After consulting with my attorney, I like to continue the severance agreement negotiation communication through email." Kennedy Decl., Exh. 20. Furthermore, Mr. Kennedy admitted in his opposition to this motion that he actually received legal advice before signing the contract, stating, "Attorney Muller advised [me] not to sign a severance agreement unless [I was] satisfied with the monetary terms since a wrongful termination took place and discrimination occurred during [my] employment and since [I] would be releasing [my] rights". *See* Docket No. 63 at 24. While the agreement was signed on October 2015, it appears that Mr. Kennedy sought or planned to seek legal advice as early as February 2015. The numerous statements suggest that Mr. Kennedy had plenty of time to consult an attorney (and represented that he did so); the "[presence] of a third-party advisers to the servient party" suggest that Mr. Kennedy's consent was not obtained through excessive pressure. *Johnson v. International Business Machines Corp.*, 891 F. Supp. at 531.

        ii. <u>Discussion of the Transaction at an Inappropriate Time</u>

Mr. Kennedy also argues that he was excessively pressured, and harassed oppressively because Defendants pressured him to negotiate during his medical leave and ignored his requests to postpone agreement discussions until his medical leave ended. *See* Docket No. 63 at 24-25.[7] However, the development of the negotiations suggests otherwise—on multiple occasions, Mr. Kennedy, not Defendants Columbus or Wilson, renewed negotiations after periods of stagnation. *See* Wilson Decl. ¶ 10, Exh. G. For example, in June 2015, Mr. Kennedy contacted Wilson inquiring as to why he had not heard back from her on the Agreement. *See* Wilson Decl. ¶ 10, Ex. G (Kennedy emailed Wilson, stating that, "[he] was hoping to connect with [her] regarding this severance agreement offer but haven't heard from [her]."). Similarly, on July 6, 2015, after

---

[7] Mr. Kennedy also alleges that Defendants were oppressive because Wilson insisted that he sign a clean version of the severance agreement but such requests do not amount to oppressive behavior. *See e.g., Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123 (1966) (excessive pressure must be accompanied by statements such as: "business must be finished at once" or "there is no time to consult an attorney)

9

1   receiving no response to his counteroffer, Mr. Kennedy emailed Ms. Wilson to ask if Columbus
2   agreed to his June 21st demands. *See* Wilson Decl. ¶ 13, Exh. J. These email exchanges are
3   evidently contrary to his allegations. Thus, Mr. Kennedy's allegations seem a far cry from
4   negotiations which were conducted at unusual or inappropriate times.

### iii.     Use of Multiple Persuaders

Mr. Kennedy appears to argue that Defendants employed multiple persuaders to influence him, pointing to one occasion when Defendants set up a "three people phone conference without [his] permission." *See* Docket No. 63 at 25. In fact, the record suggests that this purported phone conference did not take place. Instead, Wilson merely attempted to setup a call between Mr. Kennedy, his supervisor, Paul Wolfert and Wilson herself. *See* Docket No. 65 at 12. Mr. Kennedy alleges that he felt "very much pressured" by Wilson's act of arranging a three-person conference but the record suggests otherwise— Mr. Kennedy readily accepted the invitation, but declined only after consulting his attorney. *See* Docket No. 63 at 15; *see also* Docket No. 64, Exh. 18 (Kennedy replied to Wilson's request for a multi-party conference by stating, "[t]hat would be a pleasure for me to talk with Paul [his supervisor] but for a phone conference like this, I need to consult with my attorney."). Instead of demonstrating how additional individuals attempted to influence him, Mr. Kennedy merely points to one sole occasion where there is a failed attempt by Defendants to arrange for a multi-party telephone conference. His allegations are also contrary to what has been developed in the record—specifically, Mr. Kennedy admitted during his deposition that other than Wilson, he did not negotiate with anyone else. *See* Docket No. 59-1 at 31.

### iv.     Control of the Proceedings

Lastly, the record reflects that Mr. Kennedy was in control of both the timing of the negotiations and the substantive terms of severance agreement. In May 2014, Mr. Kennedy was presented with the first severance agreement ("May Agreement"), and he swiftly rejects the offer. *See* Wilson Decl. ¶ 3, Exh. A. Nine months later, on February 3, 2015, Mr. Kennedy re-initiated negotiations and informed Ms. Wilson that he was ready to negotiate and requested that negotiations occurred via email, not in person. *See* Docket No. 59-1, Exh. A ("Plt. Tr.") 88:1–9. In June 2015, Ms. Wilson subsequently presented Mr. Kennedy with an updated proposed

severance agreement in June 2015 ("June Agreement"), which Mr. Kennedy also rejected. *See* Wilson Decl. ¶ 8–9, Exh. E and F. On June 21, 2015, Mr. Kennedy submitted a counteroffer, requesting for a higher amount, and demanded that language be added to the agreement to clarify that his workers' compensation claim would not be subject to the release. *Id.* On July 6, 2015, after receiving no response to his counteroffer, Mr. Kennedy emailed Ms. Wilson to ask if Columbus agreed to his June 21st demands, and threatened to bring his employment attorney to the "table" if the negotiations did not progress. *See* Plt. Tr. 82:22-84:8; *see also* Wilson Decl. ¶ 10, Exh. G. On July 10, 2015, Ms. Wilson rejected Mr. Kennedy's demands and informed him that the June Agreement offer was still on the table but Mr. Kennedy rejected the June Agreement and demanded that Ms. Wilson engaged in further negotiations. *See* Wilson Decl. ¶ 11, Exh. H. On August 27, 2015, Ms. Wilson sent Mr. Kennedy a revised severance agreement ("Final Agreement") which included an additional sum of $15,375.00 to the June Agreement. *See* Wilson Decl. ¶ 12, Exh. I. After several more months of negotiation, in October 2015, Mr. Kennedy also managed to get Defendants to amend the scope of his release to explicitly exclude his workers' compensation claims. *See* Wilson Decl. ¶ 17, Exh. N. The record thus paints a very different picture from what Mr. Kennedy alleges; he was often in charge of the pace of the negotiations (between May 2014 to October 2015) and was actively negotiating the substantive terms of the severance agreement (where he demanded for a higher payout and ultimately negotiated for an amendment to the release before signing the agreement).

Thus, since (i) Mr. Kennedy does not dispute the fact that he consulted an attorney on multiple occasions before signing the agreement (*see* Docket No. 64, ¶¶10, 12, 22, Exh. 8, 10, 20), (ii) discussion of the final agreement did not occur at inappropriate times, (iii) Defendants did not use multiple persuaders, and (iv) Mr. Kennedy was in control of the pace and content of the negotiations, the Court finds that Mr. Kennedy's consent was not procured under excessive pressure. *See Johnson v. International Business Machines Corp.*, 891 F. Supp. at 531.

        b.        <u>Undue Susceptibility Element</u>

Mr. Kennedy also fails to demonstrate that he was unduly susceptible to establish that his consent was obtained under undue influence. "Undue susceptibility may consist of total weakness

11

of mind which leaves a person entirely without understanding; or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated; or ... a still lesser weakness which provides sufficient grounds to rescind a contract for undue influence. Such lesser weakness need not be long-lasting nor wholly incapacitating, but may be merely a lack of full vigor due to age, physical condition, emotional anguish or a combination of such factors.... In some of its aspects this lesser weakness could perhaps be called a weakness of spirit." *Johnson v. International Business Machines Corp.*, 891 F. Supp. 522, 531.

Here, Mr. Kennedy contends that he was of "weak mind" because (i) he was under the influence of Oxycodone when he signed the agreement, and (ii) he signed the agreement when he was exhausted following his two-day deposition. *See* Docket No. 63 at 11. Mr. Kennedy argues that Oxycodone "changes how [one's] body feels" and was thus of a weak mind because medication side effects. *Id.* at 11 and 25. However, under California law, Mr. Kennedy must offer more than self-serving testimony that he felt different in order to avoid summary judgment—Mr. Kennedy must prove that he was mentally incompetent to "deal with the subject before him with a full understanding of his rights." *Stratton v. Grant*, 139 Cal.App.2d 814, 817 (1956). He provides no specific credible facts that Oxycodone rendered him incompetent throughout the lengthy negotiations. Furthermore, his second argument that he signed the agreement when he was exhausted following depositions is insufficient to fulfill the undue susceptibility element. Mr. Kennedy also had seven days to rescind the agreement after he signed, and this seven day revocation period could have relieved Mr. Kennedy of any exhaustion, or tiredness he experienced during his deposition. *See* Docket No. 65 at 12. Mr. Kennedy has presented no evidence to suggest that he was of "weak mind" for the period following the signing of the Final Agreement and it would be a stretch of an inference to find that Mr. Kennedy's exhaustion lasted more than seven days and his physical condition caused him to be of "weak mind" for a sustained period of time. *See Olam v. Cong. Mortgage Co.*, 68 F. Supp. 2d 1110, 1141 (N.D. Cal. 1999) ("[a]s a general rule, age, physical condition, and suffering of pain furnish no basis for setting aside a conveyance if the [party seeking rescission] exercised a free and untrammeled mind."). Further, the fact that Mr. Kennedy negotiated to explicitly exclude his workers' compensation claims from

release clause in the Final Agreement and obtain more compensation than was initially offered by Defendants suggests that he was not of "weak mind" when he signed the Final Agreement. *See* Wilson Decl. ¶ 17, Exh. N. So does the fact that Mr. Kennedy rejected five severance agreements before signing the Final Agreement; he possessed and exercised a certain degree of bargaining power. *See* Wilson Decl. at ¶ 2.

In sum, Mr. Kennedy's consent was not obtained under "undue influence." *Skrbina v. Fleming Cos., Inc.*, 45 Cal.App.4th at 1366.

### 2. Economic Duress

Apart from undue influence, Mr. Kennedy argues his consent was procured under economic duress. To establish a claim for economic duress, Mr. Kennedy is required to prove by a preponderance of evidence the following elements: (a) Defendants engaged in a sufficiently coercive wrongful act; (b) a reasonably prudent person in Mr. Kennedy's economic position would have had no reasonable alternative but to succumb to Defendants' coercion; (c) Defendants knew of Mr. Kennedy's economic vulnerability; and (d) Defendants' coercive wrongful act actually caused or induced Plaintiff to endorse the severance agreement. *See Johnson v. International Business Machines Corp.*, 891 F. Supp. 522, 528-530 (N.D. Cal., 1995) (addressing the enforceability of a severance agreement under California law).

#### a. Coercive Wrongful Act Element

The "wrongful act need not be in the nature of a tort or crime". *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal. App. 3d 1154 (1984). However, "[m]erely being put to a voluntary choice of perfectly legitimate alternatives is the antithesis of duress . . . Encouragement is a far cry from coercion or denial of choice." *In re Executive Life Ins. Co.*, 32 Cal. App. 4th 344 (1995). Further, Mr. Kennedy must show more than economic pressure to establish economic duress. *See e.g., Osanitsch v. Marconi PLC*, 2009 WL 5125821, at *5 (N.D. Cal., 2009) ("[T]he fact plaintiff feels economic pressure to sign an agreement does not raise any inferences about a defendant's conduct, much less their wrongful conduct.").

Here, Mr. Kennedy alleges that Defendants engaged in a "wrongful act" because they terminated his employment while he was on medical leave. *See* Docket No. 64 ("Kennedy Decl.")

at ¶ 27. Mr. Kennedy also asserts that other wrongful acts include Defendants' misrepresentations of the reasons for his termination and Defendants' threats to withhold the severance payments unless the severance agreement was signed. *See* Docket No. 63 at 22. The Court finds that these allegations are insufficient to establish a materially wrongful act or acts. Termination during a medical leave does not itself establish economic duress. *See e.g., Skrbina v. Fleming Cos., Inc.*, 45 Cal. App. 4th at 1366-1367 (severance agreement enforced when plaintiff's position was eliminated during his disability leave). Furthermore, Defendants' failure to inform Mr. Kennedy the real reasons for his termination is insufficient to establish "wrongful conduct". *See also Perez v. Uline, Inc.*, 157 Cal. App. 4th at 959-960 (2007) (finding no wrongful act where plaintiff contended that severance agreement was obtained through economic duress because "defendants knew, but failed to tell him, the reason for his termination was wrongful, thereby 'depriving him of future income by false representations.'") To the extent that Defendants committed concealment of the reasons for his termination, Mr. Kennedy went into negotiations and agreed to the Final Agreement knowing that risk; the release explicitly covered discrimination claims which Mr. Kennedy must have suspected he had.

Also, Mr. Kennedy's assertion that Defendants engaged in a wrongful act by threatening to withhold severance payments unless the agreement is meritless. *See* Docket No. 63 at 22. "To the extent he argues that he was coerced into signing the release because [D]efendant told him he would not otherwise get his severance benefits, the argument fails because he was entitled to those benefits only under the terms of the [severance agreement], which included signing the release." *Skrbina v. Fleming Cos., Inc.*, 45 Cal. App. 4th 1353, 1367 (1996). Mr. Kennedy ignores the simple principle of bargained-for-exchange under contract law. *Id.*

        b.        <u>Reasonable Alternatives Element</u>

With regards to the "reasonable alternatives" prong of the analysis, courts assess whether "[a] reasonably prudent person subject to [a wrongful] act may have no alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Id.* Courts employ an objective test to determine if "reasonable alternatives" exist. *Id.* In *Johnson v. International Business Machines Corp.*, 891 F. Supp. 529 (N.D. Cal., 1995), the court found that, despite plaintiff's

14

subjective belief, he was not facing "imminent bankruptcy or financial ruin" and had reasonable alternatives to signing the severance agreement. *Id.* The plaintiff could have looked for substitute employment immediately after termination or relied on available lines of credit and reduced his discretionary expenses until he obtained another source of income. *Id.* Additionally, courts have recognized that employees confronted with whether or not to sign a severance agreement often have litigation as a reasonable alternative (*i.e.*, they can preserve their claims and pursue legal action). *See Tanner v. Kaiser Found. Health Plan, Inc.*, 2016 WL 4076116, at *5 (N.D. Cal. 2016).

Here, Mr. Kennedy contends that he was in financial hardship, and that a reasonable person in his position "would have believed that he or she had no reasonable alternative except to consent to the contract." Docket No. 63 at 22. He contends that he is unable to look for another job due to his disability[8] and states that he was under extreme financial pressure, that his bi-monthly income payment through the California State Disability Funds ended before he signed the severance agreement and that around the period of October 2015,[9] when he signed the agreement, he had only $163 in his bank account. *Id*. at 18.

### i. Mr. Kennedy's Injury

The record contradicts Mr. Kennedy's contentions that his disability prevented him from working at all. On a Medical Leave Certification Form dated May 13, 2015, Mr. Kennedy's physician stated that, "It is possible that [Kennedy] may require part time work . . . but it is based

---

[8] There are few details about the exact nature of Mr. Kennedy's injury, the effects of it or more specifically how it might affect Mr. Kennedy's job prospects. Mr. Kennedy alleges that he experienced a "major spinal injury". *See* Docket No 1-1 at 5. Mr. Kennedy also alleges that this "work injury" occurred on August 30, 2013, and was "caused by a malfunctioned automatic roll-up door closing on [him]." *See* Kennedy Decl. ¶ 3. He states further that "[d]ue to medical problems worsening, [he] started working less hours by early 2013 per physicians' recommendations." *Id*. at ¶4.

[9] Mr. Kennedy states that at the time of signing of the severance agreement, he has already received the maximum benefit amount of California State Disability Funds in the amount of $55,990. See Docket No. 64 at 37. However, the exhibit attached to his declaration fails to establish this fact as there is no date demonstrating when he received the maximum amount of benefits. *See* Docket No. 64, Exh. 22. Furthermore, the exhibit is contradictory—on one side of the document, it states that the remaining benefit amount he is entitled to receive is $0.00, and on the other side, it states that he is entitled to a remaining benefit amount of $15,971.44. *Id*.

15

on his response to clinical interventions. I recommend sedentary work at this point." Kennedy Decl., Exh. 14. Mr. Kennedy's physician also stated that it is medically necessary for Mr. Kennedy to be off work on an intermittent basis due to episodic flare-ups, and the physician estimated that the anticipated frequency of such episodes fall within the range of "1-2 times per 2-3 months." *Id.* The medical physician also estimated that these episodes will last for "1-2 days per episode." *Id.* Thus, it appears that during the negotiations, and prior to the conclusion of the severance agreement in October 2015, Mr. Kennedy's disability did not prevent him from working, or at least look for an alternate job that entails a sedentary work. *See Johnson v. International Business Machines Corp.*, 891 F. Supp. 529.

ii. Whether Mr. Kennedy Was in "Financial Ruin"

Furthermore, while Mr. Kennedy asserts that he only had $163 in his bank account, the record does not support a finding that he was in "financial ruin." *Id*. First, the record reflects that Mr. Kennedy has more than one bank account, suggesting that he has more funds than he claims. *See* Kennedy Decl., Exh. 32, 33. In his papers, he reveals nothing about other account(s). Second, Mr. Kennedy received disability benefits from the California State Disability funds from June 27, 2014 till August 25, 2015. *See* Docket No. 71 ("Plt's Supp. Brief") at 2. Third, he applied to receive disability benefits from the Social Security Disability Funds on May 19, 2015, started receiving benefits on or after October 28, 2015 and continues to receive such benefits today. *Id.* at 2. Mr. Kennedy admits that he continues to receive Social Security Disability Benefits. *See* Docket No. 59-1, Exh. A ("Depo. Tr."), 29:1-12; 107:18-108:23, Ex. 24; *see also* Docket No. 63 at 23. In other words, prior to signing the Final Agreement, Mr. Kennedy already applied to receive disability benefits from the Social Security Disability Funds, and shortly after he signed the Final Agreement, he started receiving these benefits. Fourth, in November 2014, Mr. Kennedy also applied for long-term disability benefits with Unum Life Insurance Company of America ("Unum"), a private provider of long-term disability insurance.[10] *See* Docket No. 70 ("Def. Supp. Brief") at 3; *see also* Docket No. 71 ("Vladislavich Decl.") ¶ 3. Lastly, there is simply insufficient

---

[10] Defendants have alleged that Mr. Kennedy continues to receive these benefits and Mr. Kennedy did not suggest otherwise. *Id.*

16

evidence to demonstrate that Mr. Kennedy was on the verge of "financial ruin or bankruptcy" and had no reasonable alternative but to sign the severance agreement. *Johnson v. International Business Machines Corp.*, 891 F. Supp. 529 (N.D. Cal. 1995). There is nothing on the record to suggest that Mr. Kennedy had no car, no home, or no family from whom he could borrow. Although Mr. Kennedy recently alleges that he is "still paying his debts, and [sic] [has] no money left in [his] retirement account which [he] used [sic] to provide housing, food and a decent living to [his] family," and that his "family lived under poverty due to [his] low income arisen from disability," there are no supporting documents to support such allegations, or which establish that he would have been in financial ruin if he did not accept the Final Agreement. *See* Plt. Supp. Brief at 14. Mr. Kennedy has the burden to demonstrate that he was in "financial ruin," but he has failed to make a record that he in fact had no alternatives but to sign the Final Agreement. Fed. R. Civ. P. 56(e); *see also Johnson v. International Business Machines Corp.*, 891 F. Supp. 529 (N.D. Cal. 1995).

     c. <u>Knowledge of Plight Element</u>

  Mr. Kennedy also fails to satisfy the third prong—Defendant's knowledge of his economic vulnerability. Mr. Kennedy has not demonstrated Defendants knew that Mr. Kennedy would inevitably be subject to "imminent financial ruin" if he did not sign the Final Agreement. *See Tanner v. Kaiser Found. Health Plan, Inc.*, 2016 WL 4076116, at *4. The mere fact that Defendants knew Plaintiff was about to lose his job and "needed" the money offered under the agreement is not sufficient. *See* Perez *v. Uline, Inc.*, 157 Cal. App. 4th 953, 959-960 (2007) (economic duress was not present when defendant knew plaintiff needed the money offered under the severance agreement to pay his bills).

  Here, Mr. Kennedy argues that Defendants were aware of his economic vulnerability through company records and California State records. *See* Docket No. 63 at 21:26-27, 22:24-25. He contends that Defendants are aware of his impending job loss and his application for a 401(k) loan, but nothing on the record suggests that Mr. Kennedy would inevitably be subject to almost certain "imminent financial ruin" if he did not sign the Final Agreement. *Id. See Tanner v. Kaiser Found. Health Plan, Inc.*, 2016 WL 4076116, at *4. Other than his impending job loss and

17

application for a 401(k) loan, Plaintiff has not shown Defendants knew of any additional circumstances pertaining to his financial situation. *Cf. Perez v. Uline, Inc.*, 157 Cal. App. 4th 953, 959-960 (2007).

### d. Causation element

Lastly, even if Mr. Kennedy were able to satisfy the first three elements, he has not established Defendants' alleged wrongful, coercive act "induced" him to sign the Final Agreement. Mr. Kennedy cannot establish such causation when he signed a release instead of availing himself of other reasonable alternatives (*e.g.*, pursuing legal action) particularly given the fact that he retained bargaining power, extracted concessions and received advice of counsel during the lengthy negotiations. *See Johnson v. International Business Machines Corp.*, 891 F.Supp. at 530.

In sum, Mr. Kennedy was not subject to economic duress.

### 3. Whether Consent Was the Result of Fraud

Lastly, Mr. Kennedy alleges that his consent was the result of fraud. To establish fraud, Mr. Kennedy is required to establish that Defendants engaged in a deceptive or fraudulent practice in an effort to mislead him as to the scope of the release included in the severance agreement. *McCray v. Casual Corner, Inc.*, 812 F. Supp. 1046, 1049 (C.D. Cal. 1992). When such a showing is made, "the release must be construed as settlement of those matters only as to which the minds of the parties met, and may not be considered in satisfaction of anything not consented to by the plaintiff." *McCray v. Casual Corner, Inc.*, 812 F. Supp. at 1049; see also Jefferson v. Cal. Dept. of Youth Authority, 121 Cal.Rptr.2d 391, 396 (2002) (fraudulent and deceptive behavior was not found when plaintiff fully appreciated the possibility of bringing a claim for harassment before signing the settlement release).

Mr. Kennedy argues that Defendants committed fraud because they misrepresented the real reasons for his termination. *See* Docket No. 63 at 25-26. He argues that he was the only manager to be laid off when all other managerial employees were transferred to a new facility, and Defendants' justification for terminating his employment on the grounds of "Lay-off due to San Francisco facility closure" amounts to fraudulent misrepresentation. *Id*. But his allegations of

18

fraud on the merits of his termination do not establish Defendants committed fraud and misled him about the scope of the release. His negotiations and extraction of concessions occurred with his understanding that he had potential legal claims that he was giving up. Indeed, Mr. Kennedy has admitted that he understood the nature and scope of the release, stating that his attorney "advised [him] not to sign a severance agreement unless [he] is satisfied with the monetary terms since a wrongful termination took place and discrimination occurred during his employment and since [he] would be releasing his rights." Docket No. 63 at 24. He had been advised on and understood the scope of the release and knew that the release specifically covered claims for discrimination. Even if Defendants' purported false reasons about Mr. Kennedy's termination were true, there is nothing on the record to suggest that Defendants made fraudulent representations about the terms of the Final Agreement—specifically the release clause. Mr. Kennedy cannot conflate substantive fraud claims—claims covered by the release—with alleged fraud in inducing him to enter into the severance agreement. The former does not prove the latter. The Court concludes that Mr. Kennedy did not give his consent as a result of fraud.

## V. CONCLUSION

The severance agreement is valid and enforceable. Mr. Kennedy has failed to demonstrate that his consent was obtained under duress, undue influence or fraud. The Court hereby **GRANTS** Defendants' motion for summary judgment.[11]

This order disposes of Docket No. 59. The Clerk is instructed to enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: April 23, 2018

_____
EDWARD M. CHEN
United States District Judge

---

[11] The Court notes that Defendants have filed numerous evidentiary objections, but having granted Defendants' motion for summary judgment, these evidentiary objections are **DENIED** as moot. *See* Docket No. 65 at 15-19. The Court also notes that parties have submitted a joint letter regarding a discovery dispute but having granted Defendants' motion for summary judgment, Mr. Kennedy's discovery requests are **DENIED** as moot. *See* Docket No. 62.